STATE ex rel. THAREL et al. v. BOARD OF COM'RS OF CREEK COUNTY et al.

No. 29511.   Nov. 19, 1940.

*107 P. 2d 542.*

Grace Arnold, of Drumright, and Glenn O. Young, of Sapulpa, for plaintiffs in error.

J. Berry King and George J. Fagin, both of Oklahoma City, for Lillian Powers, intervener, plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Houston E. Hill and Fred Hansen, Assts. Atty. Gen., for Leon C. Phillips, Governor of the State of Oklahoma, amicus curiae.

Fred Speakman, of Sapulpa, amicus curiae, defendant in error.

Everett S. Collins, County Attorney of Creek County, Kenneth G. Hughes, Asst. County Atty., of Creek County, and E. C. Stanard, of Shawnee, for defendants in error.

HURST, J. This case involves the question of the effect of acts fully performed by the board of county commissioners and county treasurer of Creek county, under article 14, ch. 66, S. L. 1937, prior to the decision in Ivester v. State, 183 Okla. 519, 83 P. 2d 193, adjudging the act to be unconstitutional.

The action was commenced by the state on the relation of three owners of taxable property in the city of Drumright on which the taxes had been paid, for themselves and all other taxpayers of Creek county similarly situated, against the board of county commissioners, county treasurer, and county clerk of Creek county, and three named taxpayers who had secured a reduction in their taxes, and all others similarly situated, to enjoin said officers from proceeding under article 14, ch. 66, S. L. 1937, authorizing the reassessment of property for 1936 and prior years on which the taxes were delinquent. The petition asked that all other defaulting taxpayers be enjoined from asking relief under the statute and for general equitable relief. No restraining order or injunction was issued in the cause.

The material facts, and sequence of events, are as follows: Said act by its terms took effect on May 3, 1937; the first reassessment by the board of county commissioners of Creek county, under the act, was made on May 18, 1937, and the last on July 20, 1938 (just six days before the decision was handed down in Ivester v. State, supra, adjudging the law unconstitutional); this action was filed on September 17, 1937, and in the petition seeking an injunction to prevent the county treasurer from performing any acts under the law plaintiffs alleged that said act was unconstitutional and violative, among other provisions, of

section 53, art. 5, of the State Constitution; on September 18, 1937, the Attorney General gave an opinion, which was immediately furnished to the defendant county officers, advising that since there was grave doubt as to the constitutionality of the act, the county commissioners should refrain from acting under it until the courts had passed upon the question, and the pendency of the Ivester Case in Beckham county was referred to as a test case; on November 22, 1937, the Ivester Case was decided by the district court, the law being adjudged to be unconstitutional; on November 23, 1937, the Attorney General rendered an opinion holding the act unconstitutional, calling attention to the decision in the Ivester Case, and this opinion was furnished to the board of county commissioners of Creek county a few days thereafter. Thus it is clear that the county commissioners and county treasurer of Creek county continued to act under the law after this action was filed against them questioning the constitutionality of the act, and after they had been advised by the Attorney General to refrain from acting under it, and after they were advised by the Attorney General that it had been adjudged, and was, unconstitutional.

During the time the defendant officers were proceeding under the act, they reduced the assessments and taxes on some 4,264 separate pieces of property, and the taxes were paid on the reduced assessments and tax receipts showing payment in full were issued. The record discloses that the assessed valuation of properties that had been regularly assessed and equalized for prior years was reduced from 40 to over 95 per cent. of the prior assessments. The average reduction was about 75 per cent. It is asserted that some $250,000 was collected on the reduced assessments, which means that some $750,000 in tax liabilities were attempted to be released. The record shows that as to only a part of the property in Drumright reassessed, tax liabilities aggregating $35,460.33 were liquidated by payment of $9,886.12, thereby releasing tax liabilities amounting to $25,574.21 on a part only of the properties in Drumright reassessed under the act.

After the act was held unconstitutional by this court, the plaintiffs filed an amended petition asking that the treasurer be required, by mandatory injunction or mandamus, to cancel all tax receipts issued pursuant to reassessments under the act, and to restore the tax records as they were prior to the passage of the act. Lillian Powers, owner of a bond against the city of Drumright, intervened and asked the same relief as that asked in the amended petition. From a judgment denying the plaintiffs any relief, they appeal.

1. The first question for determination is the binding effect of the acts of the board of county commissioners and county treasurer under the act, and payment by such taxpayers of the reduced amount of such taxes.

The parties, in their briefs and oral argument, have devoted most of their attention to this question. Plaintiffs contend that the law being violative of the Constitution, the acts of the officers thereunder were in excess of their power and void, and could not and did not bind the county, or relieve the property of such delinquent taxpayers from liability for the full amount of taxes due. On the other hand, the defendants contend that the board and the public were justified in assuming the act constitutional until it was judicially declared unconstitutional, and that under its provisions the board acted in a judicial capacity, and therefore such reductions, being unappealed, became final judgments, and may not be attacked collaterally in this proceeding.

a. We begin with an elementary principle of constitutional law:

"When a statute is adjudged to be unconstitutional, it is as if it had never been. Rights cannot be built up under it; contracts which depend upon it for their consideration are void; it constitutes a protection to no one who has acted under it, and no one can be punished

for having refused obedience to it before the decision was made." Cooley's Constitutional Limitations (8th Ed.) page 382.

See, also, 12 C. J. 800, 801; 11 Am. Jur. 827; 16 C.J.S. 287; 6 R.C.L. 117; Savings & Loan Ass'n v. Topeka, 20 Wall. 655, 22 L. Ed 455; City of Parkersburg v. Brown, 106 U. S. 487, 1 S. Ct. 442; Little Rock & Ft. S. Ry. Co. v. Worthen, 120 U. S. 97, 7 S. Ct. 469; State ex rel. Nuveen v. Greer, 88 Fla. 249, 102 So. 739, 37 A.L.R. 1298; State v. Candland, 36 Utah, 406, 104 P. 285; City of Henderson v. Lieber, 175 Ky. 15, 192 S. W. 830, 9 A.L.R. 620. One asserting rights under such a void law must bring himself within some established exception to this general rule. The rule that no rights may be acquired under such a statute applies as well to rights acquired under acts performed or executed pursuant to such statute before the final determination of the unconstitutionality thereof as to those sought to be acquired under acts performed thereafter.

In State ex rel. Nuveen v. Greer, supra, which involved the rights of an innocent purchaser of bonds issued under a statute thereafter declared unconstitutional, occurs an exhaustive discussion of the rule, in which many authorities are analyzed. Therein the Florida court said:

"Rights acquired under a statute that has not been adjudicated to be constitutional are subject to a subsequent adjudication that the statute is unconstitutional, even though the statute had been generally considered valid. This is so because, under the Constitution, the courts alone have the power to authoritatively determine the validity of a statute. 12 C. J. 800. Validity or invalidity relates to the enactment of a statute under the existing organic law and not to a subsequent date. The courts have no power to make a statute inoperative only from the date of an adjudicated invalidity, because the courts merely adjudge that a statute conflicts with organic law, and the Constitution then operates to make the statute void from its enactment, the courts having no power to control the operation of the Constitution."

In Central Branch U. P. R. Co. v. Smith, 23 Kan. 745, involving a similar question, the court, speaking through Justice Brewer, said:

"The law, as a law, must be valid before any acts under it can be upheld. A corporation may sometimes be estopped from showing its own wrongful acts done under a valid law, but there is no such thing as a void enactment being made valid by estoppel. If the law simply purports to grant authority to issue bonds to a specific party, and such party has not capacity to receive public aid, then the law fails, and no purchaser can plead ignorance of such party's incapacity. *The law never had any validity*, and *no acts done under it can infuse life into it, or create any estoppel upon the municipality.*" (Italics ours.)

The rule that rights or benefits claimed under an unconstitutional statute will not be protected applies with peculiar force to cases like that under consideration here. The levy, assessment, and collection of taxes is a matter of great public importance. It affects all citizens, for all citizens under our system of government are presumed to share equally, according to their ability to do so, the burden of its maintenance. As said in Savings & Loan Ass'n v. Topeka, supra, the power to tax is the strongest and most pervading of all the powers of government, reaching directly or indirectly to all classes of the people, and unless limited and restrained by proper restrictions to prevent its abuse, can be employed in such a way as will bring ruin to one class, and give wealth and prosperity to another.

The equal distribution of the burdens of government was a matter of concern to the framers of our Constitution. It goes hand in hand with the equal protection of the citizens by the laws. Each citizen is entitled to such equal protection, and as a necessary corollary is required to contribute his rightful share of the expenses of the government from which he receives protection. To achieve this result section 5, art. 10, providing that "taxes shall be uniform upon the same class of subjects," and section 53,

art. 5, providing that "the Legislature shall have no power to release or extinguish, or to authorize the releasing or extinguishing, in whole or in part, the indebtedness, liabilities, or obligations of any corporation or individual, to this state or any county or other municipal corporation thereof," were written into the Constitution. Section 5 assures equality and uniformity in the assessment of taxes, while section 53 assures equality and uniformity in the collection thereof.

It is obvious that to hold that those who sought to take advantage of the provisions of the act, without awaiting a determination of its validity, and with knowledge that under the terms of the act they were the recipients of a favor not extended to all taxpayers alike, should be protected, and the favor so illegally received secured to them, would be violative of the principles of equality. It would prefer them over those who, under the terms of the act, were equally entitled to share in the illegal favor, but who awaited the judicial determination of the constitutionality of the act by which it was attempted to be conferred. It would also prefer those citizens who had not paid their taxes over those who, like the plaintiffs, had faithfully paid their taxes and enabled, insofar as they could, the various subdivisions of the state to meet their liabilities. The insistence of defendants that we should so decide appeals neither to reason nor justice. It was to prevent just such discrimination and favoritism that section 53, art. 5, was written into our Constitution. Similar provisions are found in the constitutions of several of the other states, and had been construed and applied by the courts of those states prior to its adoption in Oklahoma.

Thus, in 1881, in State v. Hannibal & St. Joseph Ry. Co., 75 Mo. 208, the Missouri Supreme Court, referring to section 51, art. 4, of the Missouri Constitution, which is identical in substance with section 53, art. 5, of the Oklahoma Constitution, said:

"Besides, the idea of taxation imports the equality of apportionment and assessment upon all property. Cooley, Const. Lim., page 2, and cases cited. It is this which distinguishes taxation from arbitrary exaction. 2 Dillon, Munic. Corp. § 736. And it cannot be doubted that the exemption of the property of an individual or of a private corporation from taxation, either in whole or in part, casts an unusual and inequitable burden on the property of those who have not been thus graciously favored."

And in 1885, in State v. Graham, 17 Neb. 43, referring to a similar constitutional provision, the Supreme Court of Nebraska used this pertinent language:

"In effect, the Constitution guarantees to every property owner in the state that his property shall be liable for the just proportion of taxes due thereon according to the valuation as ascertained by law, and for no more. It deprives the Legislature of the power to add to this amount or to discriminate between taxpayers in any manner or form.

"Now, what the Legislature cannot do directly, it cannot do indirectly. If it cannot say to A, you must pay the entire taxes levied upon your property, and to B, you need pay but 50 per cent. of the amount thus levied, it cannot accomplish by indirection what it is prohibited expressly from doing. It is not the policy of the law to encourage the opening of a broker's shop at the place of business of every board of county commissioners by authorizing them, where the property is of value equal to the taxes due thereon, to receive less than the amount thereof. Such practice, if sanctioned, would lead to favoritism and fraud, and practically nullify the constitutional provisions. If the property will not sell for sufficient to pay the delinquent taxes due thereon —an extreme case—it is possible the Legislature may possess the power to authorize the sale for less than the taxes due. But that question is not before the court.

"Suppose A has yearly paid his taxes in full. His neighbor, B, who has valuable property adjoining that of A, fails to pay his taxes, as in this case, for twelve years, when the county purchases the property for the delinquent taxes due thereon, and soon thereafter assigns the certificate to a convenient friend of B for one-half of the amount of taxes due on the property. The other 50 per cent.

is to be made up by levying again on all the property in the county and city, including that of A and those who have already paid their taxes in full. Such procedure not only deprives those who have fully paid their taxes of the constitutional guaranty that taxes shall be levied equally on all property, so that that of each person shall pay its just proportion, but offers a premium to every taxpayer to evade the payment of taxes. It is very clear that the Legislature possesses no such power, and the assignment in the case under consideration is a nullity. * * *"

And in 1900, in Ollivier v. City of Houston, 54 S. W. 940, the Texas Court of Civil Appeals, construing a similar constitutional provision, said:

"The difficulty of formulating tax laws which may surely accomplish the equal distribution of the burdens of government seems to have been fully realized by the framers of the instrument embodying our organic law, and therefore the citizen is hedged about with provisions safeguarding him against the abuse of the taxing power. For these reasons the contention of appellant that the power rests in the Legislature to extinguish the liability of a citizen of a municipal corporation for taxes levied and assessed in a case where the vast majority of his fellow citizens have paid their part of the taxes thus levied, seems inconsistent with the spirit of our institutions and utterly untenable from any point of view."

The framers of our Constitution are presumed to have been familiar with these decisions from our neighbor states and to have had them in mind in inserting section 53 of art. 5 in our Constitution. 12 C. J. 717; 16 C.J.S. 76; 11 Am. Jur. 685.

In the face of the above authorities, it seems clear that those receiving tax reductions under said legislative act, prior to the determination of its unconstitutionality, should not be entitled to protection as to the benefits so received.

b. But the defendants assert that in revaluing and reassessing the property under the act, the board of county commissioners exercised judicial power, and that no appeals having been taken from their acts they are in the nature of final judgments, and therefore unaffected by the subsequent determination that the act was unconstitutional. In support of this contention they cite Huckins Hotel v. Board of Com'rs, 64 Okla. 235, 166 P. 1043, and Hopper v. Oklahoma County, 43 Okla. 288, 143 P. 4, holding that the action of the county board of equalization in revaluing property for taxing purposes, if not appealed from, is final and conclusive.

It is well settled that a board of county commissioners can exercise only such powers as are conferred upon it by the organic or statutory laws of the state, or such as arise by necessary implication from an express grant of power. In re Assessment of First Nat. Bank of El Reno, 64 Okla. 208, 166 P. 883. Therefore, its powers depend upon the statutes, for none are conferred upon it by the Constitution, which merely creates the board. It is essentially an administrative body, and while in the exercise of its administrative functions it acts in a quasi-judicial capacity, it is not a court. It belongs to the executive branch of the government, not the judicial. Board of County Com'rs of Kay County v. Smith, 47 Okla. 184, 148 P. 111; In re Bucher, 162 Okla. 168, 20 P. 2d 150; In re Assessment of Kansas City Southern Ry. Co., 168 Okla. 495, 33 P. 2d 772; 15 C. J. 446, note 60, also 458, note 78; 20 C.J.S. 834, note 64, also 853, note 43. The distinction between the exercise of judicial and quasi-judicial power is well stated in Board of County Com'rs v. Cypert, 65 Okla. 168, 166 P. 195, as follows:

"There is a distinction between acts that are quasi-judicial and those that are purely judicial. A quasi-judicial power is one imposed upon an officer or a board involving the exercise of discretion, judicial in its nature, in connection with and as incidental to the administration of matters assigned or intrusted to such officer or board. A good definition of a purely judicial act is found in 4 Words and Phrases, p. 3848: 'A judicial act is an act done by a member of the judicial department of government in construing the law or applying it to a particular state of facts presented for the determi-

nation of the rights of the parties thereunder.' "

In re Assessment of Kansas City Southern Ry. Co., supra, it was said:

"Every officer or board that is required, in the administration of the law, to determine whether a duty exists, or determine from facts, by the exercise of judgment, a course of action, within legislative restraints or guides, must necessarily act judicially in a sense. The power often partakes so much of the judicial function that it is spoken of as quasi-judicial. Manifestly, an officer or board, or other tribunal other than a court, may act judicially in the sense above mentioned and not do anything falling within the meaning of the term 'judicial power as to matters of law and equity'; and so a judicial officer may perform acts officially outside of such matters,—mere ministerial acts."

While, as held in Re Bucher, supra, such a board may refuse to comply with the requirements of a law which it considers unconstitutional, until its constitutionality is judicially determined, it has no power to adjudicate the validity or invalidity of legislative acts. That power is vested exclusively in the courts. 12 C. J. 775; 16 C.J.S. 48; 11 Am. Jur. 709; State ex rel. Cruce v. Cease, 28 Okla. 271, 114 P. 251; McCombs v. Dallas County (Tex. Civ. App.) 136 S. W. 2d 975, 983; Nuveen v. Greer, supra; Little Rock & Ft. S. Ry. v. Worthen, supra.

Thus, in 11 American Jurisprudence, p. 710, sec. 86, it is said:

"The determination of the constitutionality of a statute is within the especial province and duty of the courts."

And in 16 C.J.S., p. 48, sec. 13, it is said:

"From force of circumstances and conditions necessarily arising in the administration of the affairs of the government, both state and national, it is evident that those who are charged with official duties, whether executive, legislative, or judicial, must necessarily construe the Constitutions in some instances. *Generally, however, the construction of the Constitution is the peculiar province of the courts, and to them belongs the*

*final decision;* and, where a court of last resort has construed a constitutional provision, such construction is binding on all departments of the government, including the Legislature." (Italics ours.)

In Board of County Com'rs of Kay County v. Smith, supra, it was said:

"The board of county commissioners is not a judicial tribunal with power to interpret statutes of the state, and whose decisions have a conclusive effect."

As the power of the board of county commissioners is wholly dependent on the statutes, it is apparent that its decisions while acting in a quasi-judicial capacity under an invalid law are equally invalid and of no force and effect. In Hopper v. Oklahoma County, supra, Huckins Hotel v. Board of County Com'rs, supra, and in Ivester v. State, supra, it was held that decisions of the county board of equalization in the exercise of quasi-judicial power were final and conclusive if no appeal therefrom was taken, but in those cases there was no question as to the validity of the law under which the boards acted. It cannot be said that a rule applied to an act of an administrative board under a valid law extends to an act of such a board under an invalid law.

c. Equally untenable is the contention that the acts of the board in the present case are such final judgments as to make the decisions in Casner v. Meriwether, 152 Okla. 246, 4 P. 2d 19; Jones v. McGrath, 160 Okla. 211, 16 P. 2d 853; and Walker v. Stubblefield, 167 Okla. 50, 27 P. 2d 1043, applicable. These cases come under a well-defined exception to the general rule that no rights may be acquired under an unconstitutional statute. They hold that where a judgment is rendered under an unconstitutional statute, by a court having jurisdiction to determine the validity or invalidity thereof, and the question is not raised, or the invalidity of the law asserted, a party to the action is precluded, under the rule of res judicata, from thereafter asserting the invalidity of the law to avoid such judgment, even though it has been subsequently declared

unconstitutional. In such a case the rights are acquired under a valid judgment, not under the unconstitutional statute. This exception to the general rule of the effect of unconstitutional statutes is mentioned in 16 C.J.S. 290, and the reason therefor, as set out in Fast v. Gilbert, 102 Okla. 245, 229 P. 275, and Forest Lumber Co. v. Osceola Lead and Zinc Mining Co. (Mo.) 222 S. W. 398, is that one who has a good defense to an action, and does not assert it, is thereafter barred, either in an appellate court or in a collateral proceeding, from urging it to overthrow or defeat the judgment. Of course the same rule would obtain if the constitutionality of the statute was expressly raised and determined, and no appeal taken. The distinction between the cited cases and the present case is that in those cases the *court* rendering the judgment was invested with jurisdiction to determine the validity of the law, and with power to pronounce the judgment rendered, while here the *board* had no jurisdiction to determine the validity of the law, and no power to make any valid order in the exercise of quasi-judicial power, as the statute seeking to confer upon it the power to make such order was void, and therefore ineffective to vest the board with any authority.

d. Defendants also contend that parties acting in good faith under a law thereafter declared unconstitutional will be held harmless from penalty and injury, citing Wade v. Harmon, 161 Okla. 245, 17 P. 2d 690, Gordon v. Conner, 183 Okla. 82, 80 P. 2d 322, and other similar cases. In those cases it was held that administrative officers will not be penalized for acts done by them in administering a law thereafter declared unconstitutional, for the reason that they are required to administer such law and lack the power to determine its validity or invalidity. Defendants argue that the property owners whose taxes were reduced acted in good faith when they paid the reduced amounts in reliance upon the validity of the law, and that to now require them to pay the full amount originally assessed against their property is

to inflict a grave injustice upon them, and to penalize them for relying upon the validity of the law, and upon the acts of the board thereunder. We are not impressed with this contention. A similar contention was rejected in Brown-Crummer Inv. Co. v. Paulter, 70 Fed. 2d 184. There the owners of property by mandamus compelled the treasurer to accept less than the amount of special assessments due. In a later action (in the cited case), instituted by the bondholders, they were compelled to pay the balance. The court used this appropriate language: "Appellees are in a pit of their own digging."

To require the payment in full of the delinquent taxes is not the infliction of a penalty, but simply the enforcement of payment of an existing liability. No penalty is sought. The object of the present action is to force the correction of the records of Creek county, so that each property owner will bear his proportionate share of the expenses of government, and none will be favored at the expense of others. It simply seeks to enforce the mandate contained in section 53, art. 5, of our Constitution. To extend the rule announced in Wade v. Harmon to the favored taxpayers would instead penalize that great body of citizens who paid promptly the full amount of their taxes or who awaited the determination of the validity of the act before seeking relief thereunder, and would violate both section 53, art. 5, and section 5, art. 10, of our Constitution. See Sanderson v. Bateman, 78 Mont. 235, 253 P. 1100; State v. Graham, supra; County of Lancaster v. Trimble, 33 Neb. 121; State v. Hannibal & St. Joseph Ry. Co., supra. We cannot accede to the proposition that these favored few would be penalized by the requirement that they discharge their full liability to the state. It was their duty to pay the full amount under penalty of having their property sold to satisfy their tax liability. They have only partly performed that duty. They are not penalized by being required to perform their full duty.

The contentions thus made are in substance that the plaintiffs are estopped

either under the doctrine of res judicata, or by the reliance of the defendants upon the validity of the statute and acts of the officers done thereunder. But it is well settled that the doctrine of estoppel does not apply to counties in such a case (and this action is in fact prosecuted for the county and its municipal subdivisions). 19 Am. Jur. 819. In Airy v. Thompson, 154 Okla. 1, 6 P. 2d 445, this rule is stated in the third paragraph of the syllabus as follows:

" 'All persons dealing with officers or agents of counties are bound to ascertain the limits of their authority or power as fixed by the statutory or organic law and are chargeable with knowledge of such limits. No estoppel can be created by the acts of such agent or officers in excess of their statutory or constitutional powers.' 15 C. J. 541; In re Town of Afton, 43 Okla. 720, 144 P. 184."

It follows that the defendants have not brought themselves under any exception to the rule first above stated as to the effect of acts done under an unconstitutional statute, nor are any of the defenses they have urged sustainable.

2. Defendants contend that plaintiffs by their amendment attempted to make the action one for mandatory injunction or mandamus after their right to injunction had been lost by laches, and that plaintiffs were therefore not entitled to the relief sought in the amended petition. The record shows that the answer of the county officers—the first and only pleading filed by them—was filed on April 26, 1939, nearly two years after the case was filed. The other defendants filed no pleading. Whether plaintiffs pressed their demand for a restraining order, or whether such order was refused, or why the trial of the action was delayed, does not appear, either from the record or briefs. No complaint thereof was made at the trial of the action, and no motion to strike the amended petition, or other objection thereto, was filed or made. The case was tried on the theory that plaintiffs sought to force the county officers to correct their records, which defendants contended the trial court could not do in such an action but do not point out why. At the be-

ginning of the trial defendants requested the trial court to require plaintiffs to state whether they sought relief by injunction or mandamus. This the court refused to do, stating that the only question was whether the county officers had the right to proceed under the act which was later declared unconstitutional, and whether what they did under the act was illegal. The attorney for the county officers then objected to the introduction of any evidence on the ground that the trial court had no jurisdiction in the action, and that the facts stated in the amended petition were not sufficient to confer jurisdiction to determine the matter and grant the relief prayed for. The attorney for the individual defendants objected to the introduction of evidence, and moved for dismissal as to them because they were not proper parties, and as to them the court was without jurisdiction. These were the only objections made to the procedure followed by the plaintiffs, and when they were overruled the parties proceeded to try the case as one for mandatory injunction or mandamus. With the record showing no objections as to the procedure below, defendants are precluded from urging them here. Muskogee Electric Traction Co. v. Dunnam, 129 Okla. 70, 263 P. 1091; Doggett v. Doggett, 85 Okla. 90, 203 P. 223. There is no showing that defendants were prejudiced by the delay in the trial of the case, or by the filing of the amended petition. These taxpayers who secured relief after the action was filed did so with actual or constructive notice of the pendency of the action questioning the constitutionality of the act. They are thus in "a pit of their own digging" and in no position to claim prejudice by the delay. They have merely paid a portion of what they should have paid. They admit in their brief that whether the relief granted be by mandamus or mandatory injunction is immaterial. The difference between the two remedies is more in name and form than in substance. Bissey v. City of Marion, 104 Kan. 311, 178 P. 611; 18 R.C.L. 90. There is no merit to the contention that by such delay plaintiffs lost their right to relief by mandamus or mandatory in-

junction. The object of the action was the same after the amendment as before—to compel the collection of taxes that had become a fixed liability. The amendment was justified by the fact that the acts sought to be enjoined were performed during the pendency of the action, and it is settled that in such a situation the court may, by mandatory injunction in the same action, compel restoration of the status quo. 32 C. J. 24; 28 Am. Jur. 200; Texas & N. O. R. Co. v. Northside Belt R. Co., 276 U. S. 475.

3. Defendants contend that each individual taxpayer benefited by the illegal acts of the county officers should have been made a party defendant to the action if his rights were sought to be adjudicated therein. We think that the favored taxpayers were proper, if not necessary, parties to the action. They had a direct financial interest in the result. Section 152, O. S. 1931, 12 O.S.A. § 231; 32 C. J. 296; 38 C. J. 853; 14 R.C.L. 327; 18 R.C.L. 330; Kansas City v. Stewart, 90 Kan. 846, 136 P. 241; Cincinnati, etc., Ry. Co. v. Kinman, 280 Ky. 148, 132 S. W. 2d 735.

4. The next question is whether this is properly a class action against all those persons claiming rights under the act. Plaintiffs did make such taxpayers parties by joining the three individual defendants as representatives of the class and by appropriate allegations. But defendants assert that the nature of the rights of the favored taxpayers precludes a class action, and that the situation of the parties is similar to that of the plaintiffs in Stiles v. City of Guthrie, 3 Okla. 26, 41 P. 383, in which case the Territorial Supreme Court held that a class action could not be maintained.

The conditions under which a class may be brought into court by making representatives of such class parties to the action are set out in section 154, O. S. 1931, 12 O.S.A. § 233, which provides as follows:

"Where the question is one of common or general interest of many persons, or when the parties are very numerous, and it may be impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

This statute is an enactment of the rule that obtained in equity prior to the adoption of the Code. It is found in the Codes of many of the states. It is similar to rule 23 of the Rules of Civil Procedure for the Federal Courts, recently promulgated. Its purpose is to prevent a multiplicity of suits. It is "a means of enabling many persons to have their rights determined without their actual appearance in court as litigants." Pomeroy's Code Remedies (4th Ed.) page 383. The doctrine of virtual representation, which the statute authorizes, "rests upon considerations of necessity and paramount convenience and was adopted to prevent a failure of justice." Bancroft's Code Practice and Remedies, § 744. The history and philosophy back of the statute is discussed in the foregoing and the following authorities, and need not be further stated here: 21 C. J. 284; 47 C. J. 66; 20 R.C.L. 672; City of El Reno v. Cleveland-Trinidad Paving Co., 25 Okla. 648, 107 P. 163; Wood v. Dummer, 3 Mason (C.C.A.) 308, opinion by Justice Story; Faber v. Faber, 76 S. Car. 156, 56 S. E. 677; Skinner v. Mitchell, 106 Kan. 861, 197 P. 569; Tobin v. Portland Flouring Mills Co., 41 Ore. 269, 68 P. 743; Cincinnati, N. O. & T. P. Ry. v. Kinman, supra.

The Stiles Case, on which defendants rely, was an action to enjoin the collection of taxes alleged to have been illegally assessed, and the holding of the Territorial Court that in such case one taxpayer might not sue for the benefit of all was predicated upon the theory that the taxes having been assessed, the collection thereof was not a matter which affected the taxpayers as a class, so that there was a community of interest, but was in the nature of a separate demand against each which he could pay or resist as he might choose, and in which no other taxpayer was interested. The rule announced therein appears to be confined to actions to enjoin the collection of taxes, perhaps to discourage interference with the collection of the public revenue. It is of general application.

See Pomeroy's Equity Jurisprudence (4th Ed.) § 265; Youngblood v. Sexton, 32 Mich. 406, 20 Am. Rep. 654, opinion by Judge Cooley. The rule in the Stiles Case was followed by this court in recent tax cases. See Huddleston v. Vahlberg, 187 Okla. 541, 104 P. 2d 434; Davenport v. Snyder, 185 Okla. 160, 90 P. 2d 652. It does not apply to a defendant class action such as the present case which has for its ultimate purpose the enforcement of the collection of taxes.

In Hudson v. County of Atchison, 12 Kan. 140, which is cited in the Stiles Case, referring to the contention that such case was authorized by a section of the Kansas Code similar to section 723, O. S. 1931, 12 O.S.A. § 1397, the court qualified the rule, saying:

"Where a tax is illegal in the abstract, illegal in and of itself, illegal as applied to every owner of taxable property in the county or district, then every person who has property affected by such illegal tax, or so many of them as may choose, may unite in an action to restrain the collection of such tax. Thus, where a tax is levied to pay interest on illegal bonds (Bridge Co. v. Wyandotte, 10 Kan. 326), or to pay illegal street assessments (Gilmore v. Norton, 10 Kan. 491; Gilmore v. Fox, 10 Kan. 509), all persons whose property may be affected by such tax, or so many of them as choose, may unite in an action to enjoin the same; for the tax *as a tax* is illegal. But when the tax, as a tax, is valid, as for instance, an ordinary county tax, or state tax, or school tax, but becomes illegal only as applied to particular persons or property, or to particular cases, then each person severally interested must sue alone."

In Skinner v. Mitchell, supra, the court, in holding a representative action proper where plaintiffs sued to force the county treasurer to issue tax receipts to a large number of persons who by arrangement of the county had paid taxes to a failed bank, said:

"In the present case the community of interest lies in the legal questions involved, the similarity of the situation of the several taxpayers, and in the fact that the character of relief sought would be applicable to all. The case is one falling within the Code provision, and there was no misjoinder."

In Pomeroy's Code Remedies (4th Ed.) § 289, the author says:

"The right which the suit is brought to assert must in some manner or degree belong to all who are represented by the actual plaintiff; and all the persons who are represented by the actual defendant must have some interest adverse to the demand for relief set up by the action. The parties thus represented by the plaintiff or defendant may not be in privity with each other, but there must be some bond of connection which unites them all with the questions at issue in the action."

We think this is properly a class action as against those claiming benefits under the statute. There is a community of interest between the members of the class. The bond that unites them is their claim to rights arising from acts of the county officers performed under the void act. It is not contended that the three named defendants were not representative of the class or that the interests of all members of the class were not well presented at the trial. The statute was intended to cover just such a case as is here presented. There are several hundred, if not several thousand, members of the class. To join them all in one action would mean that the case could probably never be tried, as deaths, absences, and changes of interest would make it impossible to get service on all the parties and the case at issue as to all so it could be tried. To require that separate suits be filed against the members of the class would entail a multiplicity of suits so great as to clog the dockets of the courts of the county for many months and cause needless expense to the county. Each of the members of the class has a direct financial interest in the issues presented and not a mere "abstract interest" or "philanthropic impulse" in the questions of law involved, as was said in the Stiles Case. They are the only defendants having such an interest. Their aggregate interest approximates $750,000.

5. Defendants also assert that if the acts of the board of county commission-

ers are not upheld, the payments made thereunder will in effect be confiscated, as there is no legal method whereby they may be recovered, or credited on the tax records as a pro tanto payment. While the statutes do not specifically provide for crediting an amount so paid, we see no legal barrier to such action. In Logan City v. Allen, 86 Utah, 375, 44 P. 2d 1085, it was said:

"A void order of release is ineffective to discharge a valid tax lien, and the property is still subject to the tax. 'An unauthorized release will not discharge a tax lien.' 61 C. J. 947; Yellowstone Pack. & Prov. Co. v. Hays, 83 Mont. 1, 268 P. 555. So, also, 'if payment is less than the full amount due its receipt does not estop the state or municipality from collecting the balance.' 61 C. J. 970."

The payments were made as tax payments in reliance on the validity of the law, and were received by the county treasurer as tax payments. Having been so paid and received, such payments should, when the county treasurer corrects his records, be credited as payments on the amount due, and the treasurer should proceed to collect the balance. Brown-Crummer Inv. Co. v. Paulter, supra; 61 C. J. 970; Northern P. R. Co. v. Raymond, 5 Dak. 356, 40 N. W. 538; Central Union Trust Co. v. Willat Film Corporation, 99 N. J. Eq. 748, 133 Atl. 780. Thus complete relief is given to the county and its subdivisions without doing an injustice to those who acted under the law. This is in accordance with settled rules of equity. We see no reason why justice cannot be done in this way instead of reaching the same result by requiring said taxpayers to pursue the circuitous remedy authorized by section 12639, O. S. 1931, 68 O. S. A. § 184, if such section is applicable, by procuring a certificate from the board of county commissioners and then presenting the certificate to the county treasurer as a credit on the taxes.

In view of the conclusion we have reached, it is not necessary to discuss the contentions as to the rights of the intervener.

It follows that the contention of the plaintiffs must be sustained. To hold otherwise and to sustain the judgment of the trial court would be to say that constitutional inhibitions may be lightly defeated and circumvented by subordinate executive officers, acting in excess of their lawful authority, provided the acts of such officers were fully consummated before the extent of their authority is determined in the proper forum—namely, the courts. This we cannot do. Such a rule would encourage citizens to rush in and get relief under a doubtful law before its validity could be tested in the courts. It would encourage hasty action on the part of administrative officers, where deliberation and caution should be encouraged instead. It would discourage the prompt payment of taxes by holding out to the taxpayers the prospect of future legislation under which they might obtain special advantages. It would open an easy avenue for the evasion and defeat of constitutional safeguards, not only in tax matters, but in others.

Reversed, with instructions to proceed in accordance with the views expressed in this opinion.

Chief Justice BAYLESS having certified his disqualification, Honorable John F. PENDLETON was appointed as a Special Justice to sit in his stead.

RILEY, OSBORN, GIBSON, and NEFF, JJ., and PENDLETON, Special Justice, concur. WELCH, V. C. J., and DAVISON, J., dissent. CORN, J., absent.