The Attorney General is in receipt of your request for an opinion wherein you point out that there are seven major statewide authorized retirement systems, and state that the validity of each of these separate systems should be examined on the basis of Opinion No. 78-186, dated June 28, 1978. That opinion held that Section 12 of House Bill 1708, Thirty-sixth Legislature, Second Regular Session, 1978, codified as 70 O.S. 17-116.3 [70-17-116.3] (1978), violated the Oklahoma Constitution, Article V, Section 62. Your request asks in effect the following questions: 1. Did Opinion No. 78-186 reach the correct conclusion in holding that House Bill 1708, 12, violated the Oklahoma Constitution, Article V, Section 62? 2. If Opinion No. 78-186 did reach the correct conclusion, are the remaining statewide authorized retirement systems unconstitutional on the basis of the reasoning therein set forth? The provisions of House Bill 1708 are set forth in the following statutes contained in 70 O.S. 17-101 [70-17-101], et seq. (1978). 70 O.S. 17-116.1 [70-17-116.1] provides: "Every annuitant, as of July 1, 1978, shall receive, beginning July 1, 1978, a five and twenty-six one hundredths percent (5.26%) increase in retirement benefits." 70 O.S. 17-116.2 [70-17-116.2] establishes what is referred to as "Plan I." It provides in pertinent part as follows: "A. A member who retires at sixty-two (62) years of age or older or whose retirement is because of disability shall receive a monthly allowance for life equal to one and ninetenths percent (1.9%) of the member's average salary not exceeding Ten Thousand Dollars ($10,000) multiplied by the number of years creditable service under this plan. ". . . No retirement benefit payments shall be made retroactively. The retirement allowance shall be subject to adjustment to those members retiring before age sixty-two (62) in accordance with the actuarial equivalent factors adopted by the Board of Trustees. "B. The amount contributed by each member to retirement system shall be five percent (5%) of the regular annual compensation paid each member up to an annual salary of Ten Thousand Dollars ($10,000), the amount not to exceed Five Hundred Dollars ($500) per annum. "C. Each employer shall cause to be deducted from the salary of each member on each and every payroll of such employer for each and every payroll period five percent (5%) of his earnable compensation; provided, the sum of the deductions made for a member shall not exceed Five Hundred Dollars ($500) during any one (1) year. 70 O.S. 17-116.3 [70-17-116.3] establishes what shall be hereinafter referred to as "Plan II." It provides in pertinent part as follows: "A member may file an election with the Board of Trustees to enroll in Plan II. The following provisions relating to the making of contributions and the receiving of retirement benefits shall be designated as requirements of Plan II. Once a member has elected to enroll in Plan II, that member is precluded from enrolling in Plan I. "A. A member who retires at sixty-five (65) years of age or older or whose retirement is because of disability shall receive a monthly allowance for life equal to two percent (2%) of the member's average salary multiplied by the number of years of creditable service under this plan. No retirement benefit payments shall be made retroactively. "The retirement allowance shall be subject to adjustment to those members retiring before age sixty-five (65) in accordance with the actuarial equivalent factors adopted by the Board of Trustees. "B. The amount contributed by each member to the Retirement System shall be six percent (6%) of the regular annual compensation not in excess of the maximum compensation level. For the period July 1, 1978, through June 30, 1979, the maximum compensation level shall be fifteen Thousand Dollars ($15,000). Effective July 1, beginning with July 1, 1979, the maximum annual compensation level shall be increased or decreased in the same percentage proportion as the percentage of increase or decrease in the average annual compensation of members participating in the Retirement System and the maximum compensation level shall be established by rounding to the nearest One Hundred Dollars ($100). The State Superintendent of Public Instruction shall certify to the Board of Trustees the average annual compensation and the percentage of change from the preceding year on or before January 31 of each year the average salary of the member participating in the Retirement System. The certification shall be based on salary payments made for the fiscal year preceding certification. The average salary shall be determined as follows: Total salary for those persons enrolled in the Retirement System based on salary payments made for the preceding fiscal year divided by the total number of members. "C. Each employer shall cause to be deducted from the salary of each member on each and every payroll of such employer for each and every payroll period, six percent (6%) of his earnable compensation; provided, the sum of the deductions made for a member shall not exceed six percent (6%) of the maximum compensation level during any one (1) year . . ." Emphasis added. 70 O.S. 17-116.4 [70-17-116.4] provides that creditable service in either Plan I or Plan II is cumulative to achieve vesting, and that benefits will be based on the years in each plan. 70 O.S. 17-116.4 [70-17-116.4] then sets forth the following language: "B. Employees who were members of the Retirement System on June 30, 1978, and elect to contribute under Plan II shall receive a benefit no less than the sum of the following: "(1) The benefit that the member would receive had all his creditable service accrued under Plan I, and "(2) An annuity which is the actuarial equivalent of the excess of the member contributions made under Plan II over the contributions that would have been made under Plan I with respect to the same period of service, together with the accumulated interest computed at a rate determined by the Board of Trustees." Pursuant to the provisions of these statutes, any member may elect to participate in Plan II. In the absence of such an affirmative election the member remains under Plan I. An election to participate in Plan II is irrevocable and the member may not thereafter revert back to Plan I. Creditable service in either Plan I or Plan II is cumulative, and benefits will be based on the years in each plan. A member considering the filing of an election with the Board of Trustees to enroll in Plan II is confronted with the following differences: Under Plan I a member must be in service to age sixty-two to receive full benefits, while under Plan II the member must be in service to age sixty-five to receive full benefits. A member retiring before the respective retirement ages of the two plans receives an allowance which is subject to adjustment in accordance with actuarial equivalent factors. A member contributes five percent (5%) of regular annual compensation under Plan I and six percent (6%) under Plan II. Benefits calculated for a retiring member under Plan I will be based upon a monthly allowance for life equal to one and nine-tenths percent (1.9%) of the member's average salary up to $10,000 multiplied by the number of years of creditable service. A retiring member under Plan II can anticipate benefits calculated on the basis of a monthly allowance for life equal to two percent (2%) of the member's average salary multiplied by the number of years of creditable service. Opinion No. 78-186 illustrated the differences in which the two plans would operate in the example of two members with 30 years participation in the system. The first member participated exclusively in Plan I, while the second member elected to participate in Plan II after completion of his twenty-fifth year of service. The opinion noted: ". . . The member . . .would receive, under Plan I, a fixed benefit of Four Hundred Seventy-Five Dollars ($475) per month based upon the average salary limitation of Ten Thousand Dollars ($10,000) (contributing 5%). The member . . . having twenty-five years service under Plan I and five years service under Plan II (contributing 6%) would receive a Four Hundred Thirty-nine Dollars and 42/100 ($439.42) monthly benefit ($35.58 less than the member retiring under Plan I.) As can be seen in this example, the retiring member under Plan II, while making a greater individual contribution would receive substantially less benefits. This circumstance would invoke the so-called save harmless provision of H.B. 1708, set forth in Section 13A 70 O.S. 17-116.4 [70-17-116.4](B) (1978) . . ." Opinion No. 78-186 then applied the provisions of 70 O.S. 17-116.4 [70-17-116.4](B) to the above example of two members retiring under Plans I and II, respectively, and determined: "In the above-referred sic example, the retiring member under Plan II would receive, with the annuity, Four Hundred Eighty-two Dollars and Forty-seven Cents ($482.47), Seven Dollars and Forty-seven Cents ($7.47) more than the retiring member under Plan I . . . ." On the basis, then, of a variance of $7.47 in a selected hypothetical situation, Opinion No. 78-186 found 17-116.3 unconstitutional while expressly validating the "save harmless" clause, 70 O.S. 17-116.4 [70-17-116.4](B). The conclusion therein disregards the statutory provisions imposing heavier contributions upon the member receiving greater benefits. All members are offered the same choice: they may receive two percent benefits for six percent contributions under Plan II, or they may receive one and nine-tenths percent benefits for five percent contributions under Plan I. The Oklahoma Constitution, Article V, Section 62 provides: "The Legislature may enact laws to provide for the retirement for meritorious service of teachers and other employees in the public schools, colleges and universities in this state supported wholly or in part by public funds, and may provide for payments to be made and accumulated from public funds either of the state or of the several school districts. Payments from public funds shall be made in conformity to equality and uniformity within the same classifications according to duration of service and remuneration received during such service." Emphasis added. The meaning of a constitutional provision, as understood by those who framed and adopted it, must be ascertained and given effect. In Re Initiative Petition No. 281, State Question No. 441, 434 P.2d 941 (Okl. 1967). Effect must be given to the intent of the framers or those adopting the constitutional provision, and such intent must be ascertained, if possible, from the language of the instrument itself. Shaw v. Grumbine, 137 Okl. 95,278 P. 311 (1929). Should the wording of a constitutional provision be found to be plain, clear and unambiguous, the evident meaning must be followed, there being no justification for resort to interpretative aids to arrive at a different meaning. Hines v. Winters, 230 P.2d 1114
(Okl. 1957). In the absence of an ambiguity, the natural significance of words or phrases, and their given grammatical arrangement, should control. State, ex. rel. Kerr v. G.R.D.A., 195 Okl. 8, 154 P.2d 946 (1945). Article V, Section 62, of the Oklahoma Constitution was adopted by a vote of the people on State Question No. 306, Initiative Petition No. 221, at a special election held July 14, 1942. Its language clearly authorizes the Legislature, in its legislative discretion, to create a teachers retirement system which includes classification among those who are the members of such system. The restriction relates to "payments from public funds." Such payments must be made "in conformity to" standards of equality and uniformity "within the same classifications" which the Legislature has established. Opinion No. 78-186, stated: ". . . reading this latter provision as a whole, we are resolved to the meaning and interpretation that in creating a teacher's retirement system and enacting statutory provisions with regard thereto, the Legislature may create classes of members or beneficiaries within the system. However, with respect to those classes so created, persons within the same class, according to tenure or service and compensation, must receive benefits or payments pursuant to a benefit plan which is equal and uniform. In this connection, it is noted that to be equal and uniform, it would not appear that the law, or plan must universally operate on all persons alike . . ." Emphasis added. It is obvious that the constitutional requirement that payments be made "in conformity to" considerations of equality and uniformity is governed by the phrase: "within the same classifications." The term "classifications" cannot be coextensive with the phrase "teachers and other employees." Teachers and other employees constitute the members of the system among whom the Legislature may create classifications. Opinion No. 78-186 acknowledges that the Legislature may create classes of members or beneficiaries within the system. Opinion No. 78-186 states at page ten: ". . . It may be recognized that for all intents and purposes, assuming annual salary increases consistent with those historically provided, the Plan I formula places an indefinite limitation on those members retiring at the designated retirement age with thirty (30) years service, i.e. Four Hundred Seventy-five Dollars ($475) per month. Conversely, Plan II provides for a percentage of average salary (2%) with the average salary base limited in the first year at Fifteen Thousand Dollars ($15,000) and with graduated increases thereafter proportionate with subsequent annual salary increases. It can thus be seen that Plan II does not place those limitations on benefits comparably placed under Plan I. We cannot in this respect view the opposing retirement plans to be uniform and equal as to those within the same constitutionally recognized class." Emphasis added. This statement, and a similar statement on page eight in the Opin ion, is not a correct representation of the provisions of 70 O.S. 17-116.3 [70-17-116.3]. The $15,000 limitation is found only in Subsection B relating to required contributions. It is not discoverable in Subsection A relating to benefits. Sub-section B states in pertinent part as follows: "B. The amount contributed by each member to the Retirement System shall be six percent (6%) of the regular annual compensation not in excess of the maximum compensation level . . . ." Emphasis added. The term "maximum compensation level" is thereupon defined in Sub-section B in two succeeding sentences. The first sentence relates to the period "July 1, 1978, through June 30, 1979." For that period: ". . . The maximum compensation level shall be Fifteen Thousand Dollars ($15,000) . . ." The next sentence relates to the period after July 1, 1979, and states that effective July 1 of each succeeding year: ". . . The maximum annual compensation level shall be increased or decreased in the same percentage proportion as the percentage of increase or decrease in the annual average compensation of members participating in the Retirement System and the maximum compensation level shall be established by rounding to the nearest One Hundred Dollars ($100). . . ." Emphasis added. Each of these sentences defines the term "maximum compensation level" as used in the first sentence of Sub-section B which sets forth the required amount to be "contributed" by each member of the system. It has nothing to do with "benefits" as set forth in Sub-section A of 70 O.S. 17-116.3 [70-17-116.3]. The effect of this language is not to enhance the "benefits" payable to participants under Plan II, but to increase the "contribution" which they are required to make. It raises the income ceiling from which "contributions' are deductible. In that regard, it should be contrasted with the following language in 70 O.S. 17-116.2 [70-17-116.2](B) relating to Plan I. "B. The amount contributed by each member to the retirement system shall be five percent (5%) of the regular annual compensation paid each member up to an annual salary of Ten Thousand Dollars ($10,000), the amount not to exceed Five Hundred Dollars ($500) per annum." Emphasis added. The maximum contribution required under Plan I is fixed at an amount which can never exceed $500 per annum. There is no fixed salary ceiling for contributions under Plan II, other than a "maximum compensation level" which is adjusted upwards each year from $15,000. Opinion No. 78-186 contains a number of citations of authority. For example, Standard Company Dairy v. Allen, 188 Okl. 187, 108 P.2d 164 (1941), is cited for the proposition that a legislative act may not be declared unconstitutional unless its conflict with the Constitution is clear and certain. Tate v. Logan,362 P.2d 670 (Okl. 1961), is cited for its holding that restrictions and limitations upon legislative power must be strictly construed and may not be extended to include matters not covered or implied by the constitutional language used. None of the authorities cited, however, relate directly to the question of whether the legislature, by its enactment of 70 O.S. 17-116.3 [70-17-116.3], has violated the constitutional prohibition. They simply do not delineate a standard defining "equality and uniformity within the same classifications" relative to Article V, Section 62. The cases falling generally within the constitutional area covered by that language have arisen under the Equal Protection Clause and have focused on a classification embodied in the legislation. Ex parte Strauch, 157 P.2d 201 (Okl. 1945) followed Miller v. Wilson, 236 U.S. 373, 35 S.Ct. 344, decided by the Supreme Court of the United States, in holding: "The legislature is not bound, in order to support the constitutional validity of its regulation, to extend it to all classes which it might possibly reach . . . it is free to recognize degrees of harm, and it may confine its restrictions to those classes of cases where the need is deemed to be clearest." 157 P.2d 216. See also Cotton Club v. Oklahoma Tax Commission, 153 P.2d 707, (Okl. 1945). 70 O.S. 17-116.3 [70-17-116.3] contains no classification or distinction among the persons included in the constitutionally defined class. It does not, for example, provide that public school teachers are under one retirement plan and college professors or non-instructional employees are under different plans. No member of the constitutionally established classification is singled out in any manner which fails to conform to considerations of "equality and uniformity." The question is whether a retirement scheme covering all members of the constitutionally defined classification, and offering each of them the same option between two plans which are uniform in the ratio of contributions to benefits is unconstitutional. No case has been found which would impugn the constitutional validity of such legislation. Indeed, the weight of the authority is to the contrary. In the few cases decided upon the question, the courts have sustained the constitutional validity of statutory provisions relating to classification of beneficiaries of pension or retirement benefits, as against the contention that such provisions amounted to unlawful discrimination against persons who would otherwise be entitled to receive the benefits of the fund, or that it constituted class legislation not based on a reasonable ground of distinction. State ex. rel. Watson v. Lee, 163 A.L.R. 362, 370; Franklin v. Savannah, 199 Ga. 426, 34 S.E.2d 506
(1945); Hughes v. Traeger, 264 Ill. 612, 106 N.E. 431
(1914). In Krebs v. Board of Trustees of Teachers Retirement System, 102 N.E.2d 321 (Ill. 1951), it was held that classification of groups of persons for legislative purposes is primarily a question for the legislature, and the courts will not interfere unless such classification is palpably arbitrary. The court continued: "A classification of a group of persons is not arbitrary if it is based on a substantial difference between that group of persons and all other persons and such difference bears a proper relation to the purposes of the statute . . . ." 102 N.E.2d 324. All presumptions are in favor of the constitutionality of legislation once it becomes the law of the state, and all reasonable doubts must be resolved in its favor. In Thillens, Inc. v. Morey,144 N.E.2d 735 (Ill. 1957), the court declared: ". . . Where the reasonableness of the Legislation is fairly debatable the Courts will not interfere with the legislative judgment and will not substitute their judgment for that of the legislative department." These decisions are consistent with the holdings of the Supreme Court of the United States under the Equal Protection Clause. In San Antonio School District v. Rodrigues, 411 U.S. 1,36 L.Ed.2d 16, 93 S.Ct. 1278 (1973), the Court was confronted with a class action challenging the constitutionality of a state's statutory system for financing public education which authorized an ad valorem tax by each school district on property within the district to supplement funds received from the state. It was alleged that the substantial interdistrict disparities in per-pupil expenditures, attributable in a large measure to the differences in amounts received through local property taxation because of variations in the amount of taxable properties in each district, violated the Equal Protection Clause of the Fourteenth Amendment. The Supreme Court upheld the state financing system on the grounds that it did not discriminate against any constitutionally definable class. The Court said: "Thus, we stand on familiar ground when we continue to acknowledge that the Justices of this Court lack both the expertise and the familiarity of local problems so necessary to the making of wise decisions with respect to the raising and disposition of public revenues. Yet, we are urged to direct the states either to alter drastically the present system or to throw out the property tax altogether in favor of some other form of taxation. No scheme of taxation, whether the tax is imposed on property, income, or purchases of goods and services, has yet been devised which is free of all discriminatory impact. In such a complex arena in which no perfect alternatives exist, the Court does well not to impose too rigorous a standard of scrutiny lest all local fiscal schemes become subjects of criticism under the Equal Protection Clause." Emphasis added. 36 L.Ed.2d 48. As set forth in 70 O.S. 17-116.3 [70-17-116.3], the effect of Plan II is to encourage higher contributions over a more extended period of time for the purpose of enhancing the actuarial strength of the retirement system. The benefits built into the system to induce heavier contributions are not disproportionate to the contribution-benefit ratio built into Plan I. The Legislature has made no classifications, nor has it declared any distinctions by class. At most, it has afforded all members of the same constitutionally recognized class the same option to participate in either one of two retirement plans. Increased benefits may be chosen by any member of that classification provided that member is willing to make increased contributions over a longer period of time. No authority discovered would appear to deprive the Legislature of its authority to confer that option. It is, therefore, the opinion of the Attorney General that the first question be answered as follows: 70 O.S. 17-116.3 [70-17-116.3] (1978), is not unconstitutional under the provisions of Article V, Section 62, of the Oklahoma Constitution. Opinion No 78-186 is, accordingly, withdrawn. It is the further opinion of the Attorney General that the second question be answered as follows: Oklahoma's Retirement Systems are not unconstitutional under the provisions of Article V, Section 62, of the Oklahoma Constitution, or upon the basis of the reasoning set forth in Opinion No. 78-186. (JOHN PAUL JOHNSON) (ksg)