2002 OK 74

**In the Matter of the Application of the OKLAHOMA DEPARTMENT OF TRANSPORTATION FOR APPROVAL OF NOT TO EXCEED $100 MILLION OKLAHOMA DEPARTMENT OF TRANSPORTATION GRANT ANTICIPATION NOTES, SERIES 2002.**

No. 97,419.

Supreme Court of Oklahoma.

Sept. 24, 2002.

As Corrected Dec. 11, 2002.

Rehearing Denied Dec. 10, 2002.

**548**

Thomas G. Hilborne, Jr., Tulsa, Gary M. Bush, Douglas F. Price, Assistant Attorney General, and Norman N. Hill, General Counsel, Oklahoma Department of Transportation, Oklahoma City, OK, for Oklahoma Department of Transportation, Applicant.

Jerry R. Fent, Oklahoma City, OK, pro se Respondent.

BOUDREAU, Justice:

¶ 1 The Oklahoma Department of Transportation (ODOT) seeks pre-issuance approval of Grant Anticipation Notes, Series 2002, in an amount not to exceed One Hundred Million Dollars. The notes are a funding source for an ambitious highway improvement and expansion plan adopted by the Legislature in 1997 and amended in 2000. 69 O.S. Supp.1997 and 2000, §§ 2001 et. seq.[1] The ODOT is authorized to issue the notes in 69 O.S.2001, § 2001(E)(2).[2]

¶ 2 Title 20 O.S.2001, § 14.2 confers exclusive, original jurisdiction upon this Court to hear and determine ODOT's application to approve the obligations to be issued. The statute requires this Court to determine if the obligations have been properly authorized in accordance with law and that, when issued, they will constitute valid obligations in accordance with their terms. Therefore, the repeal became effective ninety days after the Legislature adjourned sine die on may 23, 2002. Okla.Const., art. 5, §§ 58.[3]

### I. Background

¶ 3 On February 1, 2002, the voting members of the Contingency Review Board (CRB), the Governor, the President Pro Tempore of the Senate and the Speaker of the House of Representatives,[4] unanimously approved the Pro Tempore's motion to approve the issuance of grant anticipation notes by the ODOT. The authorization language in § 2001(E)(2), *supra.*, requires the CRB's unanimous approval before issuance of the grant anticipation notes.[5]

---

1. 1997 Okla.Sess.Laws, ch. 329, §§ 1 *et seq.* and 2000 Okla.Sess.Laws, ch. 401, §§ 1 *et seq.*

2. In 2000, the Legislature added two sentences at the end of § 2001(E)(2) to authorize ODOT to issue grant anticipation notes. The first sentence permits the issuance of the notes and the second sentence requires "such bonds" be approved by the Contingency Review Board. Apparently, the Legislature used the terms "notes" and "bonds" interchangeably. The two sentences added to § 2001(E)(2) read:
   E.
   2. . . . .The Department of Transportation may issue Grant Anticipation Notes for projects of economic significance. Such bond issue or issues shall be subject to the unanimous approval of the Contingency Review Board.

3. The pertinent parts of 20 O.S.2001, § 14.2 provide:
   Any department, institution, board, bureau, division, commission, agency, trusteeship or authority of state government authorized to issue bonds, notes or other evidences of indebtedness ("obligations") is authorized in its discretion to file an application with the Supreme Court of Oklahoma for the approval of any obligations to be issued by it, and exclusive original jurisdiction is hereby conferred upon the Supreme Court to hear and determine each such application. . . . The decision of the Supreme Court shall be a judicial determination of the validity of the obligations, shall be conclusive as to the applicant, its officers and agents, and thereafter the obligations so approved and the revenues pledged to their payment shall be incontestable in any court in the State of Oklahoma.
   We note the Legislature repealed 20 O.S.2001, § 14.2, in 2002 Okla. Sess. Laws, ch. 481, § 4. That act had no emergency clause. Therefore, the repeal became effective ninety days after the Legislature adjourned sine die on May 23, 2001. Okla. Const., art. 5, § 58.

4. On February 1, 2002, the Contingency Review Board was comprised of Governor Frank Keating, as chairman, President Pro Tempore Stratton Taylor and Speaker Larry Adair.

5. See footnote 2, *supra.*, for the statutory text.

¶ 4 On February 4, 2002, the Transportation Commission authorized ODOT to issue grant anticipation notes in an amount not to exceed One Hundred Million Dollars.[6] The Transportation Commission is the governing and policymaking body for ODOT.[7] The Transportation Commission resolved that the proposed obligations would be paid with anticipated federal highway funds.[8]

¶ 5 On February 28, 2002, both the Executive Bond Oversight Commission (EBOC) and the Legislative Bond Oversight Commission (LBOC) unanimously approved ODOT's proposal to issue the grant anticipation notes, subject to specified conditions being satisfied prior to issuance. Under the Oklahoma Bond Oversight and Reform Act, 62 O.S. 2001, §§ 695.1 *et seq.*, the proposed grant anticipation notes must be approved by both the EBOC and the LBOC.[9]

¶ 6 On March 6, 2002, ODOT filed an application with this Court seeking a determination that the proposed obligations, Oklahoma Department of Transportation Grant Anticipation Notes, Series 2002, have been authorized in accordance with law and, if issued, are valid. Jerry Fent, a citizen and resident taxpayer and voter of the State of Oklahoma, timely filed his protest to ODOT's application.

¶ 7 Fent contends that the statutory scheme for authorizing the issuance of the proposed obligations is constitutionally flawed. He argues that the statutorily-required approval of the proposed obligations by either the CRB or the LBOC violates the state constitutional separation of powers provision. Fent also urges that the legislators sitting on the CRB and the LBOC are serving in the executive as well as legislative departments of government and are in violation of the prohibition against holding dual state offices.[10] Fent requests this Court to deny pre-issuance approval of the notes.

## II. Separation of Powers

■ ¶ 8 The Oklahoma Constitution recognizes three separate departments of government and demands each of those branches remain separate and distinct. The Oklahoma Constitution, art. 4, § 1, states:

> The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; and except as provided in this Constitution, the Legislative, Executive, and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others.

This separation of powers provision mandates that each department of the government shall be kept independent in the sense that the acts of each shall never be controlled by or subjected, directly or indirectly, to the coercive influences of either of the other departments. *York v. Turpen,* 1984 OK 26, ¶ 9, 681 P.2d 763, 767.

¶ 9 Historically, Oklahoma analyzed separation of powers issues by formalisticly classifying the governmental function as either legislative, executive or judicial in nature and assigning plenary control accordingly. In *Tweedy v. State, ex rel. Oklahoma Bar Ass'n,* 1981 OK 12, ¶¶ 9–11, 624 P.2d 1049, 1054, the Court distinguished executive and legislative duties:

> ¶ 9 Legislative, as distinguished from executive, power is the authority to make law, but not to execute it or to appoint

---

**6.** Grant anticipation notes are a financing mechanism for state highway projects whereby future federal highway funds are dedicated to repay principal, interest, and other costs associated with the notes as authorized in 23 U.S.C. § 122(b)(1995).

**7.** 69 O.S.2001, § 4006.

**8.** The Transportation Commission's Resolution, Form Note and Master Trust Indenture are included in the filings in this Court.

**9.** A letter from the State Bond Advisor dated February 28, 2002, states both the Executive and Legislative Bond Oversight Commissions approved the issuance of the proposed notes. A draft of the minutes of the LBOC indicate a voice vote of "aye" was cast by all the members, to-wit: Senators Larry Dickerson, Kevin Easley and Ted Fisher, and Representatives Larry Rice, Ron Langmacher and Opio Toure.

**10.** Because we find the approval scheme for state obligations violates the separation of powers doctrine, we do not consider the dual office holding argument.

agents charged with the duty of enforcement. The latter is purely an executive function.

¶ 11 While as a legislator in the arena of bar ethics, this Court can and does fashion, by rules, the necessary prosecutorial machinery, it cannot itself exercise enforcement powers for, or on behalf of, the instrumentality it has created.

Similarly, *City of Sand Springs v. Dept. of Public Welfare*, 1980 OK 36, ¶ 12, 608 P.2d 1139, 1146, said:

¶ 12 This Court has committed itself to the proposition that the essence of the legislative function is the determination of policy; indeed, the dichotomy between administrative acts and legislative acts hinges upon the declaration of policy, which is a legislative function, and the implementation of that policy, which is traditionally an administrative function.

¶ 10 However, the Court has also recognized that there can be blending of the three powers of government and that it is not always possible to contain the three branches of government into "water tight compartments". *See Bailey v. State Bd. of Public Affairs*, 1944 OK 301, 194 Okla. 495, 153 P.2d 235, 239 (quoting *Springer v. Govt. of the Philippine Islands*, 277 U.S. 189, 48 S.Ct. 480, 485, 72 L.Ed. 845 (1928)). This blending of powers is especially prevalent in the area of administrative law where administrative agencies and officials, in exercising the powers delegated to them, typically exercise all three types of powers and are responsive to some degree of control by each of the constitutional departments. Burgeoning administrative bureaucracies, both state and federal, now make it more difficult to neatly classify the function and make the application of the formalistic approach to separation of powers issues more problematic. *See* John Devlin, *Toward a State Constitutional Analysis of Allocation of Powers: Legislators and Legislative Appointees Performing Administrative Functions*, 66 Temple L.Rev. 1205 (1993).

¶ 11 A more practical and potentially fruitful approach to separation of powers issues was set out by the Kansas Supreme Court in *Schneider v. Bennett*, 219 Kan. 285, 547 P.2d

786 (1976). In *Bennett*, the Kansas court considered a constitutional challenge based on separation of powers to statutory powers vested in a state finance council comprised of the governor and eight members of the legislature. In an opinion holding some of the statutory powers vested in the council as constitutional and others as unconstitutional, the Kansas court stressed that the separation of powers doctrine does not in all cases prevent individual members of the legislature from serving on administrative boards or commissions created by statute.

¶ 12 Rather than focusing exclusively on how a function might be conceptually classified, the *Bennett* court considered specific facts of the case to determine whether a challenged arrangement constituted a "usurpation by one department of the powers of another department". *Id.* at 792. *Bennett* held that such a usurpation occurs when one department is being "subjected directly or indirectly to the coercive influences of" another, and when there is "a significant interference by one department with the operations of another department." *Id.* at 792. If such a usurpation by one department of the powers of another occurs, it marks a breach in the separation of power between distinct branches of government.

¶ 13 The *Bennett* court considered a non-exclusive set of four criteria in deciding separation of powers issues. The first criterium required the court to consider the "essential nature of the power being exercised. Is the power exclusively executive or legislative or is it a blend of the two?" *Id.* The second criterium asked what degree of control is the legislature trying to exercise. Is the influence coercive or cooperative? *Id.* The third criterium sought to discover the legislature's objective. "Is the intent of the legislature to cooperate with the executive by furnishing some special expertise of one or more of its members or is the objective of the legislature obviously one of establishing its superiority over the executive department in an area essentially executive in nature?" *Id.* The fourth criterium asked what is the "practical result of the blending of powers as shown by actual experience over a period of time where such evidence is available." *Id.* The *Bennett*

court acknowledged that other factors may prove relevant in different cases and encouraged consideration of specific facts which may show that a usurpation of power has occurred. *Id.* at 792–93.

### III. The Legislative Bond Oversight Commission

¶ 14 In 1987, our Legislature determined there was a need to reform current procedures regarding the issuance and sale of bonds or other obligations by state entities which are essential to the state's economic well-being and enacted the Oklahoma Bond Oversight and Reform Act.[11] 62 O.S.2001, §§ 695.1, *et seq.* Since enactment of the bond oversight legislation, no state governmental entity may issue any obligations unless such obligations have been approved by the EBOC and the LBOC. 62 O.S.2001, § 695.9. Although not specifically referenced in the highway improvement and expansion plan, LBOC approval of the proposed ODOT grant anticipation notes is required.

¶ 15 The composition of the LBOC is outlined in 62 O.S.2001, § 695.4. The statute simply provides that the Speaker of the House of Representatives and the President Pro Tempore of the Senate shall appoint three members each to the six-member LBOC. The original version of the statute required the appointment of specific committee chairpersons from the Oklahoma Senate and House of Representatives.[12] While the current version of the statute does not require the Speaker and Pro Tempore to appoint legislators to the LBOC, all current members appointed to the commission are legislators.

¶ 16 In examining whether LBOC approval of obligations to be issued by a state entity violates the separation of powers doctrine, we turn to the factors enunciated in *Bennett.* In the instant controversy, the LBOC approved grant anticipation notes after the Transportation Commission authorized the ODOT to issue the notes. In approving the notes, the LBOC exercised a power that cannot be classified as purely legislative, because it is beyond the Legislature's fundamental role to make the law. While the power may be tangentially related to the Legislature's control over fiscal matters, its dominant aspect involves carrying out legislative policy and applying it to varying conditions. *J. Brotton Corp. v. Oklahoma Alcoholic Beverage Laws Enforcement Comm'n,* 1991 OK 126, 822 P.2d 683, 685–6. In other words, the LBOC consists of individual legislators exercising powers that are primarily executive or administrative.

¶ 17 In evaluating the degree of control exercised by the commission, we note that it consists entirely of sitting legislators. No executive officer sits on the LBOC to control the power or effect that the six legislators have on this vital phase of the approval process. These six legislators can halt the entire issuance of the grant anticipation notes even if the executive branch desires to move their approval. 62 O.S.2001, § 695.9. Accordingly, the LBOC is a vehicle by which the executive department is being subjected to the coercive influence of the legislative department.

¶ 18 The question of legislative intent is closely linked to the issue of legislative control, but looks more closely at the Legislature's actual motives. In evaluating the motive of the Kansas Legislature in creating a state finance council, the *Bennett* court considered whether there was some legislative intent to cooperate, such as providing "some special expertise of one or more of its members" or if the legislature's efforts seemed to be more a matter of "establishing superiority". *Id.* at 798. Section 695.4, creating the LBOC, contains no requirement that its appointees possess any expertise, knowledge or skill valuable in evaluating bonds or anticipation notes. In contrast, the "Oklahoma State Bond Advisor", who is jointly engaged by the EBOC and the LBOC, must be "knowledgeable in the current state of the art of national and international standards for the issuance of obligations by governmental entities[.]" 62 O.S.2001, § 695.7(A).

¶ 19 The absence of any statutory language addressing the qualifications of those ap-

---

**11.** 1987 Okla.Sess.Laws, ch. 222, §§ 91–101.

**12.** 1987 Okla.Sess.Laws, ch. 222, § 94.

pointed to serve on the LBOC combined with the exclusive legislative make-up of the LBOC, results in a situation ideal for implementing legislative superiority and control over the approval process itself. While we cannot be certain this was the Legislature's motive, it is the effect achieved. Although the statute allows the Legislature the flexibility to appoint non-legislators to the LBOC, it has appointed a commission composed exclusively of legislators. This evinces a motive to retain legislative control over the note-approval process.

¶ 20 *Bennett* suggests that the reviewing court also examine the "practical effect of the blending of powers as shown by actual experience over a period of time where such evidence is available." The record before us does not reveal the historical experience of this blending of powers over time and accordingly this factor is not significant in our analysis.

¶ 21 Our analysis leads us to conclude that the power wielded by the six legislative members of the LBOC is potentially coercive and may constitute a significant interference with the executive branch in the note-approval process. The LBOC, as composed, is effectively a mini-legislature implanted in the note-approval process. We find that the challenged arrangement, the approval of the LBOC in the note-approval process, constitutes a usurpation by the Legislature of the powers of the executive branch and violates Oklahoma's constitutional separation of powers provision.

## IV. The Contingency Review Board

■ ¶ 22 The CRB consists of three voting members, the Governor, the President Pro Tempore of the Senate and the Speaker of the House of Representatives and one non-voting member, the Director of State Finance. 74 O.S.2001, § 3605(A). The Legislature created the CRB as a mechanism to deal with agency needs regarding increases in personnel or expenditures in emergency situations, "which could not have been foreseen during the preceding Legislative Session." 74 O.S.2001, § 3603(A)-(C). Subsequently, it injected the CRB in the process for approving bonds and notes to fund the highway improvement and expansion plan. The specific statutory language at issue is the last sentence of 69 O.S.2001, § 2001(E)(2): "Such bond issue or issues shall be subject to the unanimous approval of the Contingency Review Board."

¶ 23 While our analysis in deciding the separation of powers issue regarding the CRB is in many respects similar to our analysis with respect to the LBOC, there are some significant differences. The degree of control sought by the Legislature in injecting the CRB in the note-approval process is not quite as clear as that sought by requiring approval of the LBOC. Because the Governor sits on the CRB, he can exercise some control over the decisions of the CRB, especially since the board's approval must be unanimous. However, the President Pro Tempore of the Senate and the Speaker of the House of Representatives can exercise an equal amount of control over the Governor, because their votes carry the same weight as his due to the unanimity requirement. In terms of blocking the approval of the notes, the unanimity requirement allows the Governor to defeat obligations he does not want approved. At the same time the unanimity requirement may prevent the Governor from securing obligations he would like approved, because the Pro Tempore or the Speaker can veto as well. While the legislative members of the CRB do not have the absolute control over the approval process as do the members of the LBOC, they still possess a significant degree of control over an executive function.

¶ 24 The motive of the Legislature in injecting the CRB into the approval process might be viewed as suspect. The Legislature has gone beyond the justifications and original policy declarations underlying the creation of the CRB. 74 O.S.2001, §§ 3603 & 3605. The CRB was created to provide a stop-gap measure to deal with unexpected personnel and expenditure needs of various agencies when the Legislature was not in session. Implanting the CRB in the midst of the execution of the highway improvement and expansion plan goes far beyond the Legislature's original policy declarations for the CRB. It suggests that the Legislature injected the CRB in the note-approval process in

an attempt to assert more legislative control in that process. By injecting the CRB in the approval process, the Legislature has in effect placed two potential legislative obstacles, namely the Pro Tempore and the Speaker, in the path of the note-approval process.

¶ 25 While the Legislature included the Governor as a member of the CRB, his inclusion on the board is redundant, because the Governor's participation in the approval process is already provided for by virtue of his presence on the EBOC. 62 O.S.2001, § 695.5(A)(1). As a result, the only practical effect of the CRB's participation in the highway improvement statute is the addition of the Pro Tempore and the Speaker. This redundancy would further support the argument that the CRB is but an effort to maintain more legislative control of the process.

¶ 26 Our analysis leads us to conclude that the power wielded by the President Pro Tempore of the Senate and the Speaker of the House of Representatives is potentially coercive and may constitute a significant interference with the executive branch in the approval of grant anticipation notes. We find that the challenged arrangement, the approval of the CRB in the note-approval process, constitutes a usurpation by the Legislature of the powers of the executive branch and violates Oklahoma's constitutional separation of powers provision.[13]

## V. Severability

¶ 27 Because the approval mechanisms of the LBOC and CRB, as they were implemented in this approval process in February 2002, violated our constitutional separation of powers provision, this Court must consider whether the offending portions are severable and the remainder of the statutes can be preserved. The cardinal principle of statutory construction is to save and not destroy. *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1937); *Coyle v. Smith*, 1911 OK 64, 28 Okla. 121, 113 P. 944, 971. In keeping with this goal, our statutory construction jurisprudence also requires that we examine whether the legislative purpose or object in passing the act is significantly undercut or altered by the elimination of the invalid portions of the statute. See *Tulsa Exposition & Fair Corp. v. Board of Co. Comm'rs of Tulsa Co.*, 1970 OK 67, 468 P.2d 501, 507. Therefore, we must determine if the Legislature would have enacted the remainder of the statute without the offending or unconstitutional language and whether the remaining, non-offending language is capable of standing alone. *Ethics Comm'n v. Cullison*, 1993 OK 37, 850 P.2d 1069, 1077; and 75 O.S.2001, § 11a.

¶ 28 In our view, the Legislature would have, in the event that the LBOC was found unconstitutional, enacted the remainder of the Bond Oversight and Reform Act without the LBOC and clearly intended the remaining, non-offending language of the Bond Oversight and Reform Act to stand alone. The 1987 enactment of bond oversight specifically provided for severability.[14] Subsequently, the Legislature amended the bond oversight statutes, adding 62 O.S.2001, § 695.11A.[15] Section 695.11A contains language that is, in effect, a severability provision: "In the event either the Executive or Legislative Bond Oversight Commission is found unconstitutional by a final, unappeased order of a court of competent jurisdiction, all of the powers, duties and responsibilities of the Commissions shall devolve upon the Council of Bond Oversight." Section 695.11A

---

**13.** This Court notes that any questions concerning the validity or constitutionality of the CRB with regard to any power it exercises outside of 69 O.S.2001, § 2001(E)(2) is not before the Court. This opinion is not to be viewed in any manner as a statement regarding the validity of the CRB or its duties outside of the specific discussion above.

**14.** 1987 Okla.Sess.Laws, ch. 222, § 125 provided:

The provisions of this act are severable and if any part or provision shall be held void the decision of the court so holding shall not affect or impair any of the remaining parts or provisions of this act, except that, should either the Legislative Bond Oversight Commission created by Section 94 of this act or the Executive Bond Oversight Commission created by Section 95 of this act be held void, neither shall be operative.

**15.** 62 O.S.2001, § 695.11A was added in 1989 Okla.Sess.Laws, ch. 374, § 14.

clearly demonstrates that the Legislature foresaw possible constitutional problems with the LBOC and desired, in the event a court determined the LBOC to be unconstitutional, that the bond and note approval process continue without the LBOC. Accordingly, we find the required approval of the LBOC, set forth in 62 O.S.2001, § 695.9 is severable from the remainder of the Oklahoma Bond Oversight and Reform Act.

¶ 29 Likewise, we view the CRB's role in 69 O.S.2001, § 2001(E)(2) as severable from the remainder of the statute. Our view is consistent with the statutory presumption created in 75 O.S.2001, § 11a providing that if any provision of an act enacted after July 1, 1989, is found to be unconstitutional the remaining provisions shall remain valid, unless there is a judicial determination that a) the valid provisions are dependent upon and inseparably connected to the invalid provision or b) the valid provisions standing alone are incomplete and incapable of being executed.[16]

¶ 30 In 2000, the Legislature amended its highway improvement and expansion plan of 1995 to authorize the ODOT to issue grant anticipation notes for highway projects of economic significance.[17] Grant anticipation notes are a financing mechanism for state highway projects whereby future federal highway funds are dedicated to repay principal, interest, and other costs associated with the notes as authorized in 23 U.S.C. § 122(b)(1995). The obvious legislative purpose of the amendment to § 2001(E)(2) is to allow the state to utilize this financing mechanism. The amendment subjected the issuance of grant anticipation notes to the unanimous approval of the CRB. In our view, the Legislature would have authorized ODOT to participate in the financing of highway projects through grant anticipation notes to be repaid from future federal highway funds with or without the CRB approval provision.

¶ 31 The invalid provision in § 2001(E)(2) relating to the CRB is presumed to be sever-

able and Fent has failed to overcome this statutory presumption. Accordingly, we find the required approval of the CRB set forth in 69 O.S.2001, § 2001(E)(2) is severable from the remainder of the statute.

## VI.  The Notes in Controversy Have Not Been Properly Authorized in Accordance With Law

■ ¶ 32 Fent contends that if the LBOC approval is unconstitutional then the grant anticipation notes cannot be authorized in accordance with law. Fent relies on *State ex rel Tharel v. Board of Comm'rs of Creek County*, 1940 OK 468, 188 Okla. 184, 107 P.2d 542, for the proposition that an unconstitutional statute imposes no duties and confers no power. On the other hand, ODOT contends that if the LBOC is unconstitutional then LBOC approval for the issuance of the grant anticipation notes is not required and the notes may be issued without such approval.

¶ 33 The Bond Oversight and Reform Act provides for oversight and approval through the EBOC and the LBOC. 62 O.S.2001, §§ 695.4 & 695.5. Section 695.11A provides that if the LBOC is found to be unconstitutional then the powers, duties and responsibilities of both the EBOC and the LBOC devolve upon the Council of Bond Oversight.[18] In enacting § 695.11A, the Legislature clearly intended that some mechanism for oversight be in place in the bond and note approval process even if the LBOC is found to be unconstitutional. It is clear that the language of § 695.11A does not allow us to dispense with any oversight at all as suggested by ODOT.

¶ 34 The language of § 695.11A requires the proposed grant anticipation notes to be presented to the Council of Bond Oversight for consideration. Because the notes in controversy have not been presented to the Council of Bond Oversight, the approval pro-

---

**16.**  75 O.S.2001, § 11a was added in 1989 Okla. Sess.Laws, ch. 154, § 1.

**17.**  See, footnote 2, *supra.*

**18.**  The severability clause in the measure enacting the Bond Oversight and Reform Act provides that if the LBOC is declared unconstitutional then both the EBOC and the LBOC are inoperable.  See footnote 14, *supra.*

cess is not yet complete.[19] Accordingly, until the note-approval process is complete, we cannot conclude the notes have been approved in accordance with law.

## VII. Conclusion

¶ 35 In summary, the power wielded by the six legislative members of the LBOC is potentially coercive and constitutes a significant interference with the executive branch in the note-approval process. The LBOC constitutes a usurpation by the Legislature of the powers of the executive branch in violation of Oklahoma's constitutional separation of powers provision.

¶ 36 The power wielded by the President Pro Tempore of the Senate and the Speaker of the House of Representatives as members of the CRB is potentially coercive and constitutes a significant interference with the executive branch in the issuance of grant anticipation notes. The approval of the CRB in the note-approval process constitutes a usurpation by the Legislature of the powers of the executive branch in violation of Oklahoma's constitutional separation of powers provision.

¶ 37 The required approval of the LBOC, set forth in 62 O.S.2001, § 695.9 is severed from the remainder of the Oklahoma Bond Oversight and Reform Act. The required approval of the CRB set forth in 69 O.S.2001, § 2001(E)(2) is severed and stricken from the statute.

¶ 38 Today's decision that the LBOC violates the Oklahoma Constitution, art. IV, § 1, causes, by operation of 62 O.S.2001, § 695.11A, the powers, duties and responsibilities of both the EBOC and the LBOC to devolve upon the Council of Bond Oversight.

19. Although we express no opinion on whether the make-up of the Council of Bond Oversight might present the same constitutional difficulties relating to separation of powers as does the Legislative Bond Oversight Commission, we note that unlike the LBOC, the Council of Bond Oversight is not made up of a majority of legislators, nor could the members appointed by either the President Pro Tempore of the Senate or the Speaker of the House of Representatives effectively block bond approval. Title 62 O.S.2001, § 695.11A(B) provides:

B. The Council shall consist of five (5) non-legislative members. One member shall be

The proposed grant anticipation notes have not been presented to the Council of Bond Oversight, making the process as yet incomplete. Having not completed the approval process, this Court cannot determine these notes have been properly authorized in accordance with law. Title 20 O.S.2001, § 14.2 does not permit this Court to approve the grant anticipation notes if they are not authorized in accordance with the law.

**APPLICATION FOR APPROVAL OF NOT TO EXCEED $100 MILLION OKLAHOMA DEPARTMENT OF TRANSPORTATION GRANT ANTICIPATION NOTES, SERIES 2002, IS DENIED.**

WATT, V.C.J., HODGES, LAVENDER, KAUGER, SUMMERS and WINCHESTER, JJ., Concur.

OPALA, J., Concuring in Result.
Although I concur in today's denial of the application, I do not join in the text of the court's pronouncement. My views may be found in *Application of Oklahoma Capitol Imp. Auth.*, 1998 OK 25, 958 P.2d 759, 779 (Opala, J., dissenting).

HARGRAVE, C.J., Dissents.

appointed by the Speaker of the House of Representatives, one member shall be appointed by the President Pro Tempore of the Senate, two members shall be appointed by the Governor with the advice and consent of the Senate and one member shall be the Director of State Finance. Three members of the Council shall constitute a quorum. The affirmative vote of three members present and voting shall be necessary for any action taken by the Council. Appointed members shall serve a term of two (2) years and may be removed for cause by the appointing authority. Members may be appointed for additional terms.