2003 OK 105

**In the Matter of the APPLICATION OF THE OKLAHOMA DEPARTMENT OF TRANSPORTATION for Approval of Not to Exceed $100 Million Oklahoma Department of Transportation Grant Anticipation Notes, Series 2003.**

No. 99,224.

Supreme Court of Oklahoma.

Dec. 9, 2003.

Lynne C. Rogers, Assistant Attorney General, Norman N. Hill, General Counsel, Oklahoma Department of Transportation, Gary M. Bush, Oklahoma City, OK, and Thomas G. Hilborne, Jr., Tulsa, OK, for applicant.

Protestant Jerry R. Fent, pro se, Oklahoma City, OK.

Protestant Edwin Kessler, pro se, Norman, OK.

BOUDREAU, Justice.

¶1 In 2000, the Legislature authorized the Oklahoma Department of Transportation (ODOT) to issue grant anticipation notes for projects of economic significance.[1] It did so by adding two sentences to 69 O.S.Supp.1997, § 2001(E)(2), which read as follows, "The Department of Transportation may issue Grant Anticipation Notes for projects of economic significance. Such bond issue or issues shall be subject to the unanimous approval of the Contingency Review Board."

¶2 In 2002, ODOT proposed to issue a series of grant anticipation notes not to exceed $100 million and sought this Court's approval of the notes. In that original proceeding, we struck down the sentence requiring Contingency Review Board approval in § 2001(E)(2) as contrary to the constitutional separation of powers provision, severed that sentence from the statute and refused to approve issuance of the notes. *Application of the Oklahoma Department of Transportation*, 2002 OK 74, 64 P.3d 546.

¶3 In 2003, ODOT again applied to this Court for approval of proposed grant anticipation notes in an amount not to exceed $100 million.[2] In support of its application, ODOT

1. 2000 Okla. Sess. Laws, ch. 401, § 1, now codified at 69 O.S.2001, § 2001.

2. ODOT asserts that this proceeding is authorized in 20 O.S.2001, § 14.2. It is not. Section 14.2 was enacted in 2001 Okla. Sess. Laws, ch. 401, § 1, **and it was repealed** in 2002 Okla. Sess Laws, ch. 481, § 4. This proceeding is authorized in 20 O.S.2001, § 14.1. Section 14.1 provides

that any state agency "authorized to issue bonds, notes, or other evidences of indebtedness may ... file an application with the Supreme Court of Oklahoma for approval of the obligations" and that notice shall be given to "inform all persons interested that they may file protests against the issuance of the obligations and be present at the hearing and contest its legality."

asserted that 1) 69 O.S.2001, § 2001(E)(2) authorizes the issuance of the proposed grant anticipation notes; 2) grant anticipation notes are a financing device to fund a federal highway project before the federal highway aid for the project becomes available for expenditure; 3) the principal, interest and costs of the proposed notes will be retired with future receipts of federal highway aid funds; 4) the proposed notes are self-liquidating in that they will be paid from the Note Payment Fund that will be established for the deposit of Federal Transportation Funds; and, 5) the proposed notes will not be backed by the full faith and credit of the State of Oklahoma nor will they constitute a debt of the state.

¶4 Two protestants challenged ODOT's application for approval of the proposed notes. Ed Kessler, Common Cause of Oklahoma, and Jerry Fent, an Oklahoma citizen, argued that the proposed notes should not be issued without an antecedent approval by a vote of the people in compliance with Okla. Const., art. 10, §§ 23 and 25. Fent also argued that 1) legislative appointment of two of the members of the Council of Bond Oversight violates the constitutional separation of powers provision and renders the statutory

note-approval process invalid; and 2) ODOT plans to secure the notes with financial guaranty insurance which will obligate the state to reimburse the insurer if it is required to pay.[3]

¶5 The parties' contentions present two decisive constitutional issues. The first issue is whether the statutorily-prescribed method of appointment of members to the Council of Bond Oversight contravenes the separation of powers provision in the Okla. Const., art. 4, § 1. The second issue is whether the proposed notes will create a state debt subject to antecedent voter approval pursuant to the Okla. Const., art. 10, §§ 23 and 25.[4]

¶6 This proceeding invokes our original jurisdiction.[5] In original proceedings we examine the record before us to ascertain whether all the critical facts are established. Our exercise of original jurisdiction over issues of fact and law is plenary and non-deferential.[6]

## I. Background

¶7 On October 7, 2002, the Oklahoma Transportation Commission authorized ODOT to issue grant anticipation notes in an

---

**3.** At oral argument, Fent urged that ODOT should be required to make a full disclosure of the terms and conditions of the insurance before this Court renders a decision in this matter. ODOT represented to the Court that the notes will not be secured by any insurance.

**4.** ODOT also took the position that Fent has no standing as a citizen, taxpayer or voter to challenge the proposed notes. Fent responded that he is an interested person under 20 O.S.2001, § 14.1 and entitled to be heard in this proceeding. ODOT did not present any persuasive authority that would support excluding Fent as an interested person under the terms of 20 O.S. 2001, § 14.1. *Higganbotham v. State of Oklahoma ex rel. Oklahoma Transportation Commission*, 328 F.3d 638 (10th Cir.2003), is inapposite. The *Higganbotham* case determined that the plaintiff did not have standing, either as taxpayer, citizen or voter, to bring suit against the United States over whether the spending clause of the United States Constitution was violated by the federal statute authorizing the federal government to reimburse states for costs associated with the issuance of bonds for state transportation projects. It also determined that the Eleventh Amendment precluded the federal court from hearing plaintiff's claim that his rights under the Oklahoma Constitution to vote on the

state's issuance of debt were violated by an Oklahoma statute authorizing the state to issue bonds for certain highway projects. In this proceeding, Fent makes no claim against the federal government concerning a violation of the spending clause of the U.S. Constitution nor does he seek to sue the state in federal court. ODOT's challenge to Fent's standing in this proceeding has no merit.

**5.** In addition to the appellate jurisdiction and the original jurisdiction of this Court, the Okla. Const., art. 7, § 4, provides that we may exercise such other and further jurisdiction as may be conferred by statute. 20 O.S.2001, § 14.1 confers discretionary jurisdiction upon this Court to consider this matter. Section 14.1 provides in part that "Exclusive original jurisdiction shall be conferred upon the Supreme Court to hear and determine each such application ... [and the] Court may ... pass upon the applications and any protests...."

**6.** *State ex rel. Oklahoma Bar Association v. Arthur*, 1999 OK 97, ¶4, 991 P.2d 1026, 1027; *State ex rel. Oklahoma Bar Association v. Stutsman*, 1999 OK 62, ¶4, 990 P.2d 854, 856.

amount not to exceed $100 million.[7] The Commission resolved that the proposed obligations would be paid with anticipated future federal highway aid funds.[8] On October 9, 2002, the Council on Bond Oversight approved ODOT's proposal to issue the grant anticipation notes.[9] On September 25, 2003, the Council on Bond Oversight again approved issuance of the notes.[10] Neither protestant challenged the legality of the procedures of the meetings of the Transportation Commission and the Council on Bond Oversight wherein the issuance of the proposed notes was authorized and approved.

## II. Council of Bond Oversight

¶ 8 Pursuant to 62 O.S.2001, § 695.9 of the Oklahoma Bond Oversight and Reform Act, 62 O.S.2001, §§ 695.1, *et seq.*, any obligation proposed to be issued by a state governmental entity must be approved by the Executive Bond Oversight Commission and the Legislative Bond Oversight Commission. However, in *Application of the Oklahoma Department of Transportation,* 2002 OK 74, 64 P.3d 546, we considered whether legislator/membership of the Legislative Bond Oversight Commission is repugnant to the state constitution. We determined that the legislator/membership of the Legislative Bond Oversight Commission contravened the separation of powers provision in the Okla. Const., art. 4, § 1.

¶ 9 In light of this ruling in *Application of the Oklahoma Department of Transporta-*

tion, supra., the Council of Bond Oversight was established and the power and duties of the Executive and Legislative Bond Oversight Commissions devolved upon the Council pursuant to 62 O.S.2001, § 695.11A. The duties of the Council of Bond Oversight include reviewing obligations proposed to be issued by state entities for compliance with applicable laws and determining whether the purposes of the obligations are for the furtherance and accomplishment of authorized and proper public functions. 62 O.S.2001, § 695.8. The Council of Bond Oversight consists of five **nonlegislative** members. 62 O.S.2001, § 695.11A. The Director of State Finance is a member.[11] Of the other four members, one is appointed by the President Pro Tempore of the Oklahoma Senate; one is appointed by the Speaker of the Oklahoma House of Representatives; and two are appointed by the Governor with the advice and consent of the Oklahoma Senate.

¶ 10 Protestant Jerry Fent challenges the authority of the President Pro Tempore of the Senate and the Speaker of the House of Representatives to make appointments to the Council of Bond Oversight. Fent argues that the Council fulfills an executive function and appointment of its members, even nonlegislative persons, by legislators encroaches upon the executive department of government. Fent's challenge is directed to the appointment authority and not the qualifica-

7. The Oklahoma Transportation Commission is the policy making and governing body for ODOT. 69 O.S.2001, § 4006.

8. ODOT's appendix filed in this proceeding includes the Commission's 1) Amended and Restated Resolution Authorizing Issuance of Grant Anticipation Notes, Series 2003, in the Amount of Not to Exceed $100 Million, 2) Form of Grant Anticipation Note, Series 2003, 3) Form of Master Trust Indenture between Oklahoma Department of Transportation and a national banking association, and 4) Series 2003 Supplemental Trust Indenture.

9. ODOT's appendix includes a letter from the State Bond Advisor, advising that the Council on Bond Oversight approved ODOT's request to issue up to $100,000,000 Tax–Exempt Grant Anticipation Notes. That approval expired April 7, 2003. ODOT's appendix also contains a second

letter from the State Bond Advisor extending the Council's approval until October 4, 2003, pursuant to 62 O.S.2001, § 695.9(B)(4).

10. Pursuant to the Oklahoma Bond Oversight and Reform Act, 62 O.S.2001, §§ 695.1 *et seq.* and our opinion in *Application of the Oklahoma Department of Transportation, supra.*, the proposed grant anticipation notes must be approved by the Council on Bond Oversight. The State Bond Advisor may extend the Council's approval of the proposed obligation for a single period of 180 days. 62 O.S.2001, § 695.9(B)(4). Before the State Bond Advisor's extension expired October 4, 2003, the Council re-approved the proposed grant anticipation notes on September 25, 2003.

11. The Director of State Finance is appointed by the Governor with advice and consent of the Senate. 62 O.S.2001, § 41.2.

tions of the sitting members of the Council of Bond Oversight.

### III. 62 O.S.2001, § 695.11A, on its face, does not violate the separation of powers provision in Okla. Const., art. 4, § 1, by authorizing the President Pro Tempore of the Oklahoma Senate and the Speaker of the Oklahoma House of Representatives to make appointments of nonlegislative persons to the Council of Bond Oversight.

¶ 11 Although the statute authorizing ODOT to issue grant anticipation notes, 69 O.S.2001, § 2001(E)(2), does not mention the Council of Bond Oversight, the Council's approval of the proposed notes is required by the Oklahoma Bond Oversight and Reform Act, *supra.* Consequently, we must consider Fent's constitutional challenge to the appointment authority prescribed in 62 O.S. 2001, § 695.11A.

■ ¶ 12 Fent's primary argument is that legislative appointments to the Council of Bond Oversight are contrary to the express provisions in our state constitution that the three departments of government shall be separate and distinct and neither shall exercise the power belonging to the other.[12] In determining whether legislative appointments violate our state constitutional separation of powers provision we look to see if the executive department is being subjected, directly or indirectly, to the coercive influence of the legislative department and if there is a significant interference by the legislative department with the executive department. *Application of the Oklahoma Department of Transportation, supra.* The analysis involves four questions, only three of which are applicable in this matter.[13]

¶ 13 The first question considers whether the power vested in the Council on Bond Oversight is executive or legislative or a blend of the two. This question requires us to evaluate the duties of the Council with respect to obligations of a state entity. Title 62 O.S.2001, §§ 695.8 and 695.9 impose upon the Council the duty to approve proposed obligations after 1) reviewing the obligations for compliance with applicable laws, and 2) determining whether the purpose of the obligations is a proper public function or purpose. In approving proposed obligations, the Council undoubtedly exercises enforcement power, the dominant aspect of which is executive or administrative. However, in its oversight of state indebtedness, the Council exercises a power that has a clear legislative aspect. The Council's exercise of power over state obligations may properly be viewed as a blend of executive and legislative power.

¶ 14 The second question requires us to evaluate the degree of control the Legislature is attempting to exercise by authorizing two legislative appointments to the Council of Bond Oversight. We note that the statute does not permit sitting legislators to be appointed to serve on the Council as was the case in the earlier *Application of the Oklahoma Department of Transportation, supra.* Accordingly, there is an absence of direct legislative control of the Council. Of course, it may be argued that the President Pro Tempore of the Senate and the Speaker of the House can exert control over the nonlegislative persons they appoint as members of the Council and thus indirectly over the

---

12. Okla. Const., art. 4, § 1, states:
 The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; and except as provided in this Constitution, the Legislative, Executive, and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others.

13. *Application of the Oklahoma Department of Transportation,* 2002 OK 74, at ¶ 13, 64 P.3d at 550–51, considered four questions in deciding whether legislators sitting as the Legislative Bond Oversight Commission violate the separation of powers: 1) Is the Commission's power exclusively executive or legislative or a blend of the two? 2) What degree of control is the Legislature attempting to exert through the legislative membership of the Commission? 3) Is the Legislature attempting to cooperate with the executive by furnishing some expertise or is it attempting to exert its superiority over the executive department? And, 4) What is the practical result of the blending of powers as shown by actual experience over a period of time, if evidence is available? Because the record before us presents no evidence regarding the practical result of the blending of powers to oversee the issuance of obligations proposed by state governmental entities, we do not consider the fourth question.

Council itself. However, a majority of the members of the Council, sufficient to control the note-approval process (three of the five), are gubernatorial appointments. The power of approval remains in the executive department. We can discern no legislative intent to control the Council of Bond Oversight by vesting appointment authority in the President Pro Tempore of the Senate and the Speaker of the House.

¶ 15 The third question—whether the Legislature is attempting to encroach upon or interfere with the executive department—again requires us to consider legislative intent or motives. In fulfilling its oversight responsibilities respecting obligations of state entities, the Council of Bond Oversight is charged with the duty to hire a bond advisor who must be knowledgeable of national and international standards for the issuance of obligations by governmental entities.[14] The State Bond Advisor assists the Council in overseeing the issuance of public indebtedness.[15] The Council is the govern-mental entity to which the Legislature and the Governor would turn to stay abreast of the debt levels and to assure responsible public indebtedness.[16] We can discern no legislative motive to encroach upon or interfere with the executive department through the Council of Bond Oversight. Rather, we view the Council as an attempt to cooperate with the executive department to assure that both the executive and legislative departments have a reliable source of information concerning public indebtedness.

■ ¶ 16 In summary, we conclude that the appointments to the Council of Bond Oversight by the President Pro Tempore of the Oklahoma Senate and the Speaker of the Oklahoma House of Representatives do not subject the executive department, directly nor indirectly, to the coercive influence of the legislative department. Accordingly, 62 O.S. 2001, § 695.11A, on its face, does not violate the separation of powers provision in the Okla. Const., art. 4, § 1.[17]

14. 62 O.S.2001, § 695.7, as amended by 2003 Okla. Sess. Laws, ch. 215, § 1, effective May 14, 2003, provides that the Council of Bond Oversight shall appoint the State Bond Advisor with the advice and consent of the Senate. Originally, the Oklahoma State Bond Advisor was a full-time-employment position in the Department of Central Services. 62 O.S.2001, § 695.7(B). As of July 1, 2003, the Office of the Oklahoma State Bond Advisor is a separate and distinct agency of the state. *Id.* and 2003 Okla. Sess. Laws, ch. 215, § 2, 62 O.S.Supp.2003, § 695.7a(A).

15. The State Bond Advisor must be knowledgeable in the current standards for the issuance of obligations by governmental entities and experienced in the negotiations of matters essential to providing the best price and terms of obligations for the benefit of Oklahoma firms, farms, individuals and local communities. 62 O.S.2001, § 695.7(A). The duties of the State Bond Advisor are 1) to provide assistance and advice to state governmental entities with respect to issuance of obligations, 2) to review, negotiate and approve or disapprove fees and expenses for goods and services requisite to issuance of obligations, 3) to represent the interests of the state before rating agencies and credit enhancement providers, and 4) to serve as an advisor to the Governor and Legislature with respect to issuance of indebtedness reviewed by the Council. 62 O.S.2001, § 695.7.

16. In 62 O.S.2001, § 695.2, the Legislature declared its intent to establish procedures for significant systematic oversight of the issuance of bonds and other obligations by state governmental entities to preserve the economic well-being of the state and to protect the public welfare of the state.

17. Fent also contends that the legislative appointments to the Council on Bond Oversight impermissibly invades the executive department because executive power extends not only to enforce the laws but also to appoint the officers, employees and agents charged with the duty to enforce the laws. *Springer v. Government of the Philippine Islands*, 277 U.S. 189, 201–202, 48 S.Ct. 480, 482, 72 L.Ed.2d 845, 849. Although this is a recognized principle inherent in the American constitutional system of government, we have long recognized that the Governor's constitutional appointment power is limited in Oklahoma. *Riley v. State ex rel. McDaniel*, 1914 OK 251, 43 Okla. 65, 141 P. 264. *Riley* teaches that our state constitution does not vest the appointment power as an exclusive function of either the executive, legislative or judicial departments; and that the language in Okla. Const., art. 6, § 13, authorizing the Governor to commission all officers not otherwise commissioned by law, does not vest the appointment of executive officers exclusively in the Governor. *Riley* considered whether the statute which named the Secretary of the State Senate to serve as the Secretary of the State Election Board intervened with the Governor's appointment authority provided in Okla. Const., art. 6, § 13. Rejecting the argument that a legislature may not create an office and then fill the office, *Riley* observed that it is the people who decide which department of

## IV. Grant Anticipation Notes

¶ 17 Finding no constitutional infirmity in the statutory note-approval process under the facts and circumstances presented in this matter, we now turn to the second issue. Do the proposed grant anticipation notes create a debt subject to the provisions of the Okla. Const., art. 10, §§ 23 and 25?

¶ 18 The Supreme Court of Colorado summarized the federal highway aid statutes that gave rise to grant anticipation debt financing of highway projects by the states in *Submission of Interrogatories on House Bill 99–1325*, 979 P.2d 549, 552 (Colo.1999). The federal government has guaranteed that 90.5 percent of payments made into the Federal Highway Trust Fund [18] attributable to highway users in each state for the years 1998 through 2003 will be allocated to the respective state as available federal highway aid. 23 U.S.C. § 105(f). As a condition to receiving federal highway aid to reimburse the cost of a project, each state must pay its share of ten to twenty percent of the project cost. 23 U.S.C. § 120(a). Federal highway aid is reimbursed on a pay-as-you-go system. Historically, federal highway aid reimbursements could be used to pay the principal of a state debt but not interest or issuance costs. To avoid the delays in the pay-as-you-go-

system, the National Highway System Designation Act of 1995 authorized the use of federal highway aid to pay interest, insurance and costs of issuance as well as the principal portion of debt issued to finance federal-aid highway projects. 23 U.S.C. § 122(b).

¶ 19 Since the 1995 statutory changes, several states have structured or are structuring debt financing to be retired, at least in part, with future federal highway aid reimbursements. These financing mechanisms are referred to as grant anticipation revenue vehicles or GARVEEs, although grant anticipation notes are also referred to as GANs.[19]

## V. The facts regarding the proposed grant anticipation notes

 ¶ 20 ODOT's application and briefs in support set forth the following basic facts regarding the proposed GARVEE notes. The principal amount of the GARVEE notes may not exceed $100 million. The term of the GARVEE notes may not exceed twenty years. The average interest rate to be paid on the GARVEE notes may not exceed seven percent and the underwriting discount may not exceed three percent.[20] ODOT has not yet identified any particular project for which

government may exercise the power of appointment and that the governor does not possess any inherent power of appointment by virtue of his or her office. *Keating v. Edmondson*, 2001 OK 110, ¶ 16, 37 P.3d 882, 889–90, reaffirmed the teachings of *Riley*.

18. The federal Highway Trust Fund is created in 26 U.S.C. § 9503. Funds in the Highway Trust Fund may be expended only for the planning, research, development and construction of Federal-aid highways. 23 U.S.C. § 101.

19. Memorandum to Division Administrators from Michael J. Vecchietti, Director of Administration, Federal Highway Administration, United States Department of Transportation, dated August 18, 2000, regarding GARVEE Bond Guidelines. The guidelines of the Federal Highway Administration (FHWA) set out the requirements that must be satisfied in financing federal highway aid projects through state debt, GARVEE bonds or notes, to be retired with federal highway aid funds. These requirements include the following steps: 1) The state (ODOT) identifies the project and designates the project for advance construction. 2) FHWA reviews the re-

quest to assure the project is eligible for federal highway aid under one or more categories listed in 23 U.S.C. § 115. 3) FHWA approves the advance construction designation and executes a project agreement with the ODOT. 4) ODOT constructs the project with GARVEE debt financing. 5) ODOT requests the project agreement be modified to convert the project to a federal highway aid project. 6) ODOT includes the project in its State Transportation Improvement Plan, a short-term plan covering at least three years which includes a priority listing of projects to be carried out in the three-year period and which conforms with the long-term transportation plan. 7) The project agreement is modified whereupon, the federal highway aid for the project is obligated. 8) ODOT requests reimbursement for project costs incurred. And, 9) FHWA reimburses the federal highway aid share of the project costs to ODOT.

20. In approving issuance of the GARVEE notes, the Oklahoma Transportation Commission gave ODOT discretion to fix the principal amount to be borrowed, the number of years before maturity and the interest that will accrue on the principal.

the proceeds of the proposed GARVEE notes will be expended.[21]

¶ 21 The face of the GARVEE notes will include an express provision that they are not backed by the full faith and credit of the State of Oklahoma nor are they an obligation of the state. ODOT's promise of payment on the GARVEE notes is conditioned on receipt of federal highway aid funds allocated by Congress but ODOT does not promise that any future Congress will allocate any funds or that it will, in the future, receive any federal highway aid funds. Further, the GARVEE notes will not constitute a commitment, guarantee, or obligation on the part of the United States as provided in 23 U.S.C. § 122.

¶ 22 No future state appropriation will be required to retire the GARVEE notes. They are to be retired solely with future federal highway aid distributed to and held in trust by or on behalf of ODOT in the Note Payment Fund. As the federal highway aid funds are received by or on behalf of ODOT, they will be placed in the Note Payment Fund. In the event of default by ODOT, the rights of the holders of the GARVEE notes are limited to the funds held in the Note Payment Fund.

## VI. The proposed grant anticipation notes will not constitute a state debt and are not subject to the Okla. Const., art. 10, §§ 23 and 25.

[8] ¶ 23 In the division of governmental power, the state fiscal policy is constitutionally vested in the Legislature.[22] However, other constitutional provisions, such as art. 10,

---

**21.** The authorizing statute, 69 O.S.2001, § 2001(E)(2) does not designate the highway projects "of economic significance" for which the proceeds of the GARVEE notes may be expended. The list of possibilities is provided in the Amended and Restated Resolution of the Oklahoma Transportation Commission, exhibit A, which reads as follows:

> Projects of economic significance, some or all of which may be funded, in whole or in part, with the proceeds of Grant Anticipation Notes are:
> 1. I–44 beginning at the Arkansas River Bridge, extending eastward to Yale Avenue, Tulsa
> 2. US 77 (Broadway Extension) bridges and roadway, with interchange at I–44, from 1/4 mile north of Northeast 63rd Street south to Northeast 36th Street, Oklahoma City
> 3. US 70 beginning at Interstate 35 and ending at Durant
> 4. US 70 beginning at Idabel and ending at Hugo
> 5. SH 99 beginning at I–40 south to Ada
> 6. US 59 beginning at U.S. 271 and ending at Interstate 40
> 7. US 183 beginning at U.S. 70 and ending at Interstate 40
> 8. SH 3 beginning at SH 34 and ending at SH 33
> 9. SH 88 beginning at U.S. 412 and ending at Interstate 44
> 10. SH 20/88 beginning at Claremore and ending at South Bypass
> 11. US 169 beginning at Interstate 244 and ending at 21st Street, Tulsa
> 12. US 77 beginning at Interstate 44 and ending at Memorial Road, Oklahoma City.

From the FHWA's perspective (see, footnote 19), identification of the federal highway aid project is the first step in constructing a highway project through GARVEE debt financing. However, from ODOT's perspective, approval of the proposed GARVEE notes must be the first step and identification and approval of FHWA of specific federal-aid highway projects to be financed through GARVEE notes would be the second and third steps. It would simply be inefficient for ODOT to seek FHWA's approval to finance a federal aid highway project with GARVEE notes before the issuance of the notes had been approved. To avoid such inefficiency, the FHWA generally requires that ODOT have final decision-making authority. 23 C.F.R. § 1.3 (ch. 1, 4–1–03 Edition), provides that the laws of a state must authorize the state highway department "to make final decisions for the State in all matters relating to ... all contracts and agreements for projects and take such other actions on behalf of the State as may be necessary to comply with the Federal laws and the regulations in this part."

The protestants in this proceeding do not challenge ODOT's application as premature because the projects have not been identified and approved by FHWA as projects to be constructed with GARVEE note proceeds. Here, notice of this proceeding was given and protests were filed. The protests present an actual controversy worthy of this Court's exercise of its jurisdiction. Even if the application is premature and this Court's opinion is advisory in nature, we have jurisdiction to issue such an opinion in the exercise of our original jurisdiction to review a proposed indebtedness. *See, Application of Fun Country Development Authority,* 1977 OK 138, ¶ 3, 566 P.2d 1167, wherein this Court, refusing to render an advisory opinion on a proposed indebtedness in the absence of an actual controversy, said: "Today we decline to follow these precedents on the grounds that we will issue no further advisory opinions. This is not to say, however, that this court lacks such jurisdiction."

**22.** Okla. Const., art. 4, § 1 (separation of powers); art. 5, § 1 (legislative authority); and art. 10 (revenue and taxation).

§§ 23 and 25, impose limitations on the Legislature's control of state fiscal affairs.

¶24 Commonly referred to as the balanced-budget amendment, art. 10, § 23, prohibits a state agency operating on state revenue from incurring "obligations in excess of the unencumbered balance of cash on hand."[23] The obvious intent of this prohibition is to place all state agencies on a pay-as-you-go cash basis[24] and prevent the pledging of state revenue that will be collected in future years or the creating of obligations for state revenues that would otherwise be available for general purposes of future years.[25] Article 10, § 25 requires that a legislative enactment creating or authorizing the creation of a state debt, other than necessary to repel invasion as provided in art. 10, § 24, must be approved by a vote of the people before taking effect. Whether the GARVEE notes, if issued, would constitute a state debt under the Okla. Const., art. 10, § 23 is a judicial question.[26]

¶25 The proposed GARVEE notes when issued by the Oklahoma Department of Transportation will constitute an obligation payable solely from future receipts of federal highway aid dedicated to the retirement of the notes. The principal, interest, or costs of the GARVEE notes will not be paid with future revenues raised by the taxing power of this State, nor will they be paid from future funds that would otherwise be available for general governmental purposes. In the event of default, note holders will be paid only from the Note Payment Fund and any receipts of federal highway aid dedicated to the retirement of the notes. Under these circumstances, the proposed GARVEE notes will not constitute a debt of the State of Oklahoma under the Okla. Const., art. 10, § 23. Accordingly, antecedent voter approval pursuant to the Okla. Const., art. 10, § 25 is not required for issuance of the proposed GARVEE notes.[27]

**PROPOSED OKLAHOMA DEPARTMENT OF TRANSPORTATION GRANT ANTICIPATION NOTES, SERIES 2003, NOT TO EXCEED $100 MILLION APPROVED.**

WATT, C.J., OPALA, V.C.J., and HODGES, LAVENDER, KAUGER, SUMMERS, and BOUDREAU, JJ., concur.

HARGRAVE, J., concurs in result.

WINCHESTER, J., disqualified.

---

**23.** Okla. Const., art. 10, § 23, reads in pertinent part:

The state shall never create or authorize the creation of any debt or obligation, or fund or pay any deficit, against the state, or any department, institution or agency thereof, regardless of its form or the source of money from which it is to be paid, except as may be provided in this section and in Sections 24 and 25 of Article X of the Constitution of the State of Oklahoma.

. . . .

5. . . . Any department, institution or agency of the state operating on revenues derived from any law or laws which allocate the revenues thereof to such department, institution or agency shall not incur obligations in excess of the unencumbered balance of cash on hand. . . .

**24.** *State ex rel. Kerr v. Grand River Dam Authority*, 1945 OK 9, ¶23, 195 Okla. 8, 154 P.2d 946, 951.

**25.** *Boswell v. State*, 1937 OK 727, 181 Okla. 435, 74 P.2d 940, 945.

**26.** *Id.* at 943.

**27.** We note that the paperwork in this original proceeding does not inform this Court of the projects now in progress or those that will be included in this GARVEE note issue. The Court is confident that before the proposed GARVEE notes are issued, ODOT will have rules promulgated addressing the projects in progress whose amounts will stand included in the issue.