2011 OK 76

**Senator Jim WILSON, Petitioner,**

v.

**Mary FALLIN, Governor of the State of Oklahoma, Kris Steele, Speaker of the Oklahoma House of Representatives, Brian Bingman, President Pro Tempore of the Oklahoma State Senate, Paul Ziriax, Secretary of the Oklahoma State Election Board, Respondents.**

**No. 109,652.**

Supreme Court of Oklahoma.

Sept. 1, 2011.

Rehearing Denied Oct. 3, 2011.

Mark Hammons, Oklahoma City, Oklahoma, for petitioner Senator Jim Wilson.

Neal Leader, Nancy Zerr, Assistant Attorneys General, for respondents Governor Mary Fallin and Secretary Paul Ziriax.

Robert McCambell, Lee Slater, Oklahoma City, Oklahoma, for respondent President Pro Tempore Brian Bingman.

Andrew Lester, Edmond, Oklahoma, for respondent Speaker Kris Steele.

TAYLOR, C.J.

¶ 1 This is a proceeding to review the State Senate Redistricting Act of 2011 (the Redistricting Act), Enrolled Senate Bill 821, sections 2 through 6, signed by the Governor on May 20, 2011. Two threshold first impression legal questions are presented: 1) What part, if any, of the apportionment formula in section 9A, Article V of the Oklahoma Constitution[1] remains in effect, and 2) What is the extent of a review proceeding authorized in section 11C, Article V of the Oklahoma Constitution? Our answer to the first question is that the population-based aspect of the apportionment formula in section 9A remains in effect, while the county-based aspect of the apportionment formula is invalid. Our answer to the second question is that the extent of a review proceeding authorized by section 11C is limited by section 11D to a review for compliance with section 9A's population apportionment formula. Having reviewed the filings, contentions, and arguments herein, we determine and hold that the Senate Redistricting Act of 2011 complies with the population apportionment formula in section 9A, Article V of the Oklahoma Constitution.

---

1. All section references are to Article V of the Oklahoma Constitution unless otherwise stated.

¶ 2 Oklahoma State Senator Jim Wilson, a resident of Cherokee County, Oklahoma, filed a petition pursuant to section 11C for review of the Redistricting Act.[2] Senator Wilson named as respondents Mary Fallin, the Governor of Oklahoma;[3] Kris Steele, the Speaker of the Oklahoma House of Representatives; Brian Bingman, President Pro Tempore of the Oklahoma Senate; and Paul Ziriax, Secretary of the Oklahoma Election Board. As required by section 11C, Senator Wilson filed a proposed apportionment plan that he contends more closely complies with Article V than does the Redistricting Act.

¶ 3 Senator Wilson alleges that the Redistricting Act does not comply with section 9A because it "fails to create Senate districts which as nearly as possible provide for compactness, political units, historical precedents, economic and political interests." Senator Wilson does not explicitly identify every district in the Redistricting Act that he contends is not in compliance with section 9A but claims that he has identified such districts by the maps provided in his appendix.[4] Senator Wilson's petition prays that this Court direct the Apportionment Commission to modify the Redistricting Act "to achieve conformity with" the Oklahoma Constitution.

¶ 4 Senator Wilson points out what he considers the primary differences in the Redistricting Act and his proposed apportionment plan. He states that the largest district in the Redistricting Act has 78,943

persons and the largest district in his plan has 78,929 persons—a difference of fourteen persons—[5]and that the smallest district in both plans has 77,350 persons. Based on a method that compares a district's boundaries to a circle, Senator Wilson posits that the Redistricting Act's average district compactness is 58.9% and that his plan's average district compactness is 65.5%. Senator Wilson points out that the Redistricting Act splits counties eighty times but that his plans split counties only sixty-two times.

¶ 5 Respondent Paul Ziriax, Secretary of the Oklahoma State Election Board, filed a preliminary statement, contending that the review of legislative apportionment provided in section 11C is limited in section 11D to a review for "compliance with the formula as set forth in this Article." Secretary Ziriax questions whether there is a manageable standard for adjudication of challenges brought under section 11C because a large part of section 9A was declared unconstitutional in *Reynolds v. State Election Bd.*, 233 F.Supp. 323, 329 (W.D.Okla.1964), and then reinstated in an emasculated form in *Ferrell v. State ex rel. Hall*, 339 F.Supp. 73, 74 (W.D.Okla.1972). Secretary Ziriax asks this Court to address whether this proceeding is a superficial contest between the Legislature's redistricting map and Senator Wilson's proposed redistricting map.[6] Secretary Ziriax urges that this matter be quickly resolved so that his office might adequately prepare for the 2012 election cycle.

2. Senator Wilson initiated this proceeding as a qualified elector, not in his official capacity as a state senator. Section 11C, Article V of the Oklahoma Constitution authorizes any qualified elector to petition the Supreme Court for a review of apportionment legislation.

3. The Honorable Mary Fallin, Governor of the State of Oklahoma, moved to be dismissed. The Governor's motion to dismiss is rendered moot by our resolution of this proceeding.

4. Senator Wilson explicitly identifies his senate district 3 as a redrawn district in the Redistricting Act that does not comply with section 9A. Senator Wilson alleges that the Redistricting Act unnecessarily divided three counties in drawing district 3 and removed the heart of the Cherokee Nation from district 3.

5. Based on the 2010 United States census, Oklahoma has a population of 3,751,351 persons. United States Census 2010, 2010 Census Data,

http://2010.census.gov/2010census/data/ (last visited Aug. 2, 2011). Dividing the state's total population by the total senate districts, the ideal senate district would contain 78,153 persons.

6. Secretary Ziriax also asks this Court to address whether tribal boundary lines are a proper consideration, particularly since the Cherokee Nation's Indian country is a patchwork quilt collection of trust land and restricted allotments scattered throughout fourteen counties. Because in this special review proceeding before this Court, pursuant to § 11C, art. V, Okla. Const., we conclude that the constitutional apportionment formula must be based on population and that the Redistricting Act complies with the population-based formula, we need not address whether tribal areas or historic precedents should be considered in apportionment.

¶ 6 Respondent Brian Bingman, President Pro Tempore of the Oklahoma State Senate, in his recommendations to this Court, also advances threshold issues: what is the proper standard or test for determining whether apportionment legislation complies with Article V as required by section 11D; whether and to what extent section 9A is viable after being declared unconstitutional in *Reynolds v. State Election Bd.* and then declared partially constitutional in *Ferrell v. State ex rel. Hall;* whether population is the only mandatory criterion in section 9A; which issues presented herein are justiciable; and what is the Court's role in this review proceeding. The President Pro Tempore also suggests a procedure for taking evidence in this proceeding, if needed. Respondent Kris Steele, Speaker of the Oklahoma House of Representatives, filed a report adopting the procedure suggested by the President Pro Tempore.

¶ 7 Responding to the respondents' suggestions, Senator Wilson admits that he is not asserting a claim under the Voting Rights Act, 42 U.S.C. §§ 1973, *et seq.;* states there is no need for a briefing schedule in this proceeding; and opposes any order issued by this Court that would allow the Election Board to prepare for the 2012 election under the Redistricting Act. The President Pro Tempore asks to file a brief on issues relevant to the 2012 election in reply to Senator Wilson.

¶ 8 We agree with the respondents that we must address, for the first time, the application of sections 9A, 11C, and 11D of the apportionment provisions in Article V of the Oklahoma Constitution. Sections 9A, 10A, and 11A through 11E were added to Article V by State Question 416, Referendum Petition No. 142, adopted at a special election held May 26, 1964. The 1963 Legislature proposed State Question 416 in Senate Joint Resolution No. 4, 1963 Okla. Sess. Laws, p. 736, to establish constitutional reapportionment formulas for both houses. In the joint resolution, the Legislature resolved that county-based apportionment, with consideration given to "the federal analogy, history, economics, custom, territory, and similar and related factors," was a proper method of providing adequate and fair representation of groups with like political, social, and economic interests and of avoiding divesting segments of the population of their representation.

¶ 9 Section 9A provides for forty-eight state senate districts to be based on the most recent federal decennial census. It provides that each of the nineteen most populous counties constitutes a senate district and the fifty-eight less populous counties be joined into twenty-nine two-county districts. It further provides that population, compactness, area, political units, historical precedents, economic and political interests, contiguous territory, and other factors are to be considered to the extent feasible in apportioning the state senate. Section 9A fixes the term of the senate office as four years with one-half of the senators elected at each general election.

¶ 10 Section 11C authorizes any qualified voter to petition the Supreme Court for review of any apportionment by the Legislature or the Apportionment Commission[7] within sixty days from the filing thereof. It provides that the petition must set forth a proposed apportionment more nearly in accordance with Article V and requires that the review petition be given precedence over other cases pending before the Supreme Court. Section 11D directs that this Court "shall determine whether or not the apportionment order of the Commission or act of the legislature is in compliance with the formula as set forth in this Article...." Section 11D further directs the Supreme Court to remand the matter to the Apportionment Commission if the Court determines that the apportionment order or act is not in compliance with the formula as set forth in Article V.

---

7. Section 11A establishes the Apportionment Commission and provides for it to act whenever the Legislature refuses to make the apportionment within ninety legislative days after convening the first regular session of the Legislature following the Federal Decennial Census.

Amended in 2010, a seven member Bipartisan Commission on Legislative Apportionment replaced the Apportionment Commission. State Question 748, Legislative Referendum 349, adopted November 2, 2010.

¶ 11 When the county-based apportionment formula in section 9A was submitted to a vote of the people, many states' legislative districts were based on units of local government and rural/urban distinctions. Several states, including Oklahoma, had failed to reapportion and redistrict for decades. Many states were involved in litigation challenging the legislative apportionment. The state courts had declined to resolve apportionment complaints, considering them to be nonjusticiable political matters, and many state apportionment schemes were challenged in federal court. Then the United States Supreme Court handed down its opinion in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), abandoning the established rule that legislative apportionment and congressional districts are purely legislative or political matters. *Baker v. Carr* determined that the Tennessee voters presented a justiciable claim under the Equal Protection Clause of the Fourteenth Amendment. Three decades later, the United States Supreme Court made it clear that state courts may exercise jurisdiction over legislative apportionment and that federal courts should defer to state action over questions of state apportionment by state legislatures and state courts. *Growe v. Emison*, 507 U.S. 25, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993).

¶ 12 Two years after *Baker v. Carr*, the opinion in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), determined the standard for implementing *Baker v. Carr*. In *Reynolds v. Sims*, Alabama residents and taxpayers alleged that the state legislature had failed to reapportion since the beginning of the twentieth century, that the apportionment among the counties was uneven, and that the voters were victims of serious discrimination under the Equal Protection Clause of the Fourteenth Amendment

and the Civil Rights Act, 42 U.S.C. § 1983. Recognizing that the right to vote is fundamental in our free and democratic society, the *Reynolds* opinion focused on the impermissible impairment of the constitutionally protected right to vote. The *Reynolds* opinion determined that population, and not location, must be the controlling criterion for judgment in legislative apportionment controversies, 377 U.S. at 568, 84 S.Ct. at 1384, and held that "as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." *Id.* The *Reynolds* opinion concluded that an apportionment plan based on political subdivisions of the state is impermissible under the Equal Protection Clause. 377 U.S. at 576, 84 S.Ct. at 1389. Emphasizing that the overriding objective of apportionment must be substantial equality of population so that each vote is equal in weight to every other vote, the *Reynolds* opinion recognized that some deviation in population may be permissible, but factors such as history and economic or group interests may not be used to justify population disparities or to stray from the equal-population or one-man-one-vote principle. 377 U.S. at 579–580, 84 S.Ct. at 1391. Rejecting any apportionment scheme not controlled by population,[8] the *Reynolds* opinion explained that it makes no difference under the Equal Protection Clause whether the apportionment scheme is established by statute or state constitution. 377 U.S. at 584, 84 S.CT. at 1393.

¶ 13 Oklahoma had been involved in apportionment litigation before a three-judge panel in the federal district court for several years when the United States Supreme Court handed down its opinion in *Reynolds v. Sims*. In light of *Reynolds v. Sims*, the three-judge

---

**8.** In addition to *Reynolds*, in 1964, the Supreme Court struck down the legislative apportionment of several other states, such as Maryland in *Maryland Comm. for Fair Representation v. Tawes*, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964); Virginia in *Davis v. Mann*, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964); and Colorado in *Lucas v. Forty–Fourth General Assembly*, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964), for failing to be population-based contrary to the Equal Protection Clause of the Four-

teenth Amendment. Also, the *Reynolds* opinion noted that suits had been instituted challenging the apportionments in thirty-four states, 84 S.Ct. at 1378–1379, n. 30, and that it had remanded several cases to the courts below for reconsideration in light of *Baker v. Carr*, listing *Scholle v. Hare*, 369 U.S. 429, 82 S.Ct. 910, 8 L.Ed.2d 1 (1962) (challenging a Michigan apportionment), and *WMCA, Inc. v. Simon*, 370 U.S. 190, 82 S.Ct. 1234, 8 L.Ed.2d 430 (1962) (challenging a New York apportionment).

panel ruled that the legislative apportionment provisions in section 9A are null and void. *Reynolds v. State Election Bd.,* 233 F.Supp. 323 (1964). The three-judge panel specifically left standing only the provision in section 9A that established the forty-eight senatorial offices with the four-year terms and the provision that one-half of the senatorial offices will. be elected every two years. 233 F.Supp. at 329. The three-judge panel further ruled that. the provisions in sections 11A through 11E, establishing the Apportionment Commission and providing for Supreme Court review and exercise of original jurisdiction, do not conflict with the federal constitution and are valid. *Id.* In 1972, another three-judge panel in *Ferrell v. State of Oklahoma,* 339 F.Supp. 73, 76 (1972), reconsidered the validity of the provisions in section 9A and ruled that it is permissible, but not mandatory, for the Legislature to consider the factors of compactness, area, political units, historical precedents, economic and political interests, and contiguous territory set out in section 9A in apportioning legislative districts. As will be discussed, we reach a conclusion that is similar in several respects to the conclusions reached in *Reynolds v. State Election Bd.* and *Ferrell v. State of Oklahoma.*

▮ ¶ 14 Although we have discussed the apportionment provisions of Article V in deciding a challenge to congressional redistricting, *Alexander v. Taylor,* 2002 OK 59, 51 P.3d 1204, this is the first time, since its adoption, we have addressed the validity and meaning of the language in sections 9A, 11C, and 11D of Article V. We construe the relevant constitutional provisions mindful of the general rules that a constitutional provision must be construed and applied according to the intent of the people adopting the provision, and absent ambiguity, the intent must be determined from the language. *Okla. Elec. Coop., Inc. v. Okla. Gas and Elec. Co.,* 1999 OK 35, ¶ 7, 982 P.2d 512, 514.

▮ ¶ 15 As to section 9A, it is clear that the county-based apportionment formula is rendered a nullity by the basic constitutional standard that state legislative districts must be based on equality in the total population under the Equal Protection Clause of the Fourteenth Amendment and *Reynolds v. Sims,* 377 U.S. at 533, 84 S.Ct. at 1362, and its progeny. There is no doubt that the voters intended "compactness, area, political units, historical precedents, economic and political interests, and contiguous territory" in section 9A to require that local interests be considered in pairing the lesser-populated counties. However, *Reynolds v. Sims* teaches that if "divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviation from the equal-population principle are constitutionally permissible...."[9]   377 U.S. at 579, 84 S.Ct. at 1391. While the language defining the county-based aspect of the apportionment formula must be severed, the other provisions in .section 9A can be left standing.

▮ ¶ 16 The presumption that legislation is constitutional and should be sustained against challenge where it is possible to do so applies to constitutional provisions. *Local 514 Transport Workers Union of America v. Keating,* 2003 OK 110, ¶ 15, 83 P.3d 835, 839. Where, as here, state constitutional language is contrary to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the invalid language should not nullify the valid provisions, *City of Spencer v. Rayburn,* 1971 OK 38, ¶ 6, 483 P.2d 735, 737, if they are severable. *Elk City v. Johnson,* 1975 OK 97, ¶ 12, 537 P.2d 1215, 1217. Unless we determine that the valid provisions are dependent upon and inseparably connected to the invalid provision or that the valid provisions standing alone are incomplete and incapable of being executed, they are severable. 75 O.S.2001, § 11a;

---

9. We note that the United States Supreme Court has recognized some flexibility in drawing state legislative districts based on equality in the total population. *Abate v. Mundt,* 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971). In doing so, the Court rejected application of local interests to justify deviations from population for apportionment of state legislative districts. The Court recognized that "deviations from population equality must be justified by legitimate state interests" and that "state interests offered to justify deviations from population equality" must be carefully scrutinized. 403 U.S. at 185, 91 S.Ct. at 1906–1907.

*In re Application of Okla. Dept. of Transp.,* 2002 OK 74, ¶ 27, 64 P.3d 546, 553.

■ ¶ 17 The invalid language defining the county-based apportionment formula is presumed to be severable, *In re Application of Okla. Dept. of Transp.,* at ¶ 31, and no party argues otherwise. Accordingly, we find the language defining the county-based apportionment formula in section 9A to be severable without the necessity of a severability analysis.

¶ 18 The remaining language in section 9A provides a population appropriation formula for apportioning senate districts. A population apportionment formula necessarily requires equality in the state's total population so that the forty-eight senate districts have only minimal deviation from the ideal district population determined by the most recent Federal Decennial Census. However, we recognize that local interest factors such as compactness, political units, and economic and political interests are considered under the totality of the circumstances principle in racially-motivated gerrymander and minority-vote dilution claims under the federal Voting Rights Act, 42 U.S.C. §§ 1973, *et seq.,* which are not presented herein.

■ ¶ 19 The opinions in *Reynolds v. Sims* and its progeny do not affect sections 11C and 11D. Notwithstanding, we consider sections 11C and 11D because they control this proceeding. Section 11C reads:

Any qualified elector may seek a review of any apportionment order of the Commission, or apportionment law of the legislature, within sixty days from the filing thereof, by filing in the Supreme Court of Oklahoma a petition which must set forth a proposed apportionment more nearly in accordance with this Article. Any apportionment of either the Senate or the House of Representatives, as ordered by the Commission, or apportionment law of the legislature, from which review is not sought within such time, shall become final. The court shall give all cases involving apportionment precedence over all oth-

er cases and proceedings; and if said court be not in session, it shall convene promptly for the disposal of the same.

Section 11D reads:

Upon review, the Supreme Court shall determine whether or not the apportionment order of the Commission or act of the legislature is in compliance with the formula as set forth in this Article and, if so, it shall require the same to be filed or refiled as the case may be with the Secretary of State forthwith, and such apportionment shall become final on the date of said writ. In the event the Supreme Court shall determine that the apportionment order of said Commission or legislative act is not in compliance with the formula for either the Senate or the House of Representatives as set forth in this Article, it will remand the matter to the Commission with directions to modify its order to achieve conformity with the provisions of this Article.

■ ¶ 20 Reading section 11C in conjunction with section 11D,[10] the review proceeding in this Court authorized in section 11C is limited to a claim that the apportionment does not comply with the population formula in section 9A. Section 11C contemplates that the petitioning qualified voter will demonstrate in the proposed apportionment 1) where the challenged apportionment does not comply with section 9A's apportionment formula and 2) where the proposed apportionment is more nearly in accordance with section 9A's apportionment formula. Section 11D contemplates that this Court will consider the petition, the proposed apportionment, and the challenged apportionment legislation for compliance with Article V as a matter of law. Our reading of sections 11C and 11D leaves the fact-intensive challenges to legislative apportionment and congressional districts, such as racially-motivated gerrymander claims, minority-vote dilution claims, and other voter discrimination claims under the Equal Protection Clause of the Fourteenth Amendment or the Voting Rights Act, 42 U.S.C. §§ 1973 *et seq.,* to the plenary jurisdiction of the district courts.

---

**10.** General rules of statutory construction are used in construing the constitution such as the rule that provisions in *pari materia* should be construed together. *Cowart v. Piper Aircraft Corp.,* 1983 OK 66, ¶ 4, 665 P.2d 315, 317.

¶ 21 In his initial filings, Senator Wilson asked for evidentiary and briefing schedules, asserting that no deference may be given to the senate districts in the Redistricting Act and that the respondents must bring forth evidentiary support for the districts. This assertion is incorrect. Every statute is presumed constitutional. *Local 514 Transport Workers Union of America v. Keating*, 2003 OK 110, ¶ 15, 83 P.3d 835, 839. We treat the State Senate Redistricting Act of 2011 in Enrolled Senate Bill 821 at sections 2 through 6, to be codified as sections 80.35 through 80.35.4 of Title 14 of the Oklahoma Statutes, as valid statutes until their nonconformity to the constitution is clearly shown. *TXO Production Corp. v. Oklahoma Corp. Comm.*, 1992 OK 39, ¶ 7, 829 P.2d 964, 968. Further, the cases Senator Wilson relied on, *United States v. Village of Port Chester*, 704 F.Supp.2d 411 (S.D.N.Y.2010), and *Hunt v. Cromartie*, 526 U.S. 541, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999), are inapposite. *Village of Port Chester* was a vote dilution challenge to local legislative districts brought on behalf of the Hispanic vote under the federal Voting Rights Act. In that case, the federal district court considered the list of factors set out by the Senate Judiciary Committee as guideposts in the broad-based inquiry of the totality of the circumstances under the Voting Rights Act. *Hunt* was a challenge to racially-motivated gerrymander in drawing a North Carolina congressional district. In *Hunt*, the United States Supreme Court recognized that assessing motive requires the court to inquire into all available circumstances and evidence. This case does not present, and in section 11C review proceedings we do not consider, minority-vote dilution claims or racially-motivated gerrymander claims, nor do we assess legislative motive.[11]

¶ 22 Turning to the challenge to the Redistricting Act, Senator Wilson effectively agrees that the apportionment therein is based on population, but he complains that it was drawn with little or no regard for compactness and local political and economic interests. Senator Wilson admits that the district with the most population (78,943) in the challenged act includes only fourteen more people than his most populous district with 78,929. He also admits that the least populous district in both the challenged act and his proposed plan has 77,350 people. Senator Wilson makes no showing that the challenged act does not comply with the population formula in section 9A.

¶ 23 We conclude that the population apportionment formula set out in section 9A, Article V, Oklahoma Constitution, remains in effect. We also conclude that a review proceeding authorized by section 11C, Article V, Oklahoma Constitution, is limited by section 11D, Article V, Oklahoma Constitution, to a review for compliance with the population apportionment formula set out in section 9A, Article V, Oklahoma Constitution, as a matter of law. We find the petitioner has failed to clearly demonstrate that the presumed constitutional State Senate Redistricting Act of 2011 does not comply with section 9A, Article V of the Oklahoma Constitution. We determine and hold that the State Senate Redistricting Act of 2011 complies with the population apportionment formula set out in section 9A, Article V of the Oklahoma Constitution.

**STATE SENATE REDISTRICTING ACT OF 2011 COMPLIES WITH SECTION 9A, ARTICLE V, OKLAHOMA CONSTITUTION.**

TAYLOR, C.J., COLBERT, V.C.J., (by separate writing), and KAUGER, WATT, WINCHESTER, EDMONDSON, REIF, COMBS, and GURICH, JJ., concur.

COLBERT, V.C.J., with whom WATT, COMBS, and GURICH, JJ. join, concurring.

¶ 1 By an election held May 26, 1964, the people of Oklahoma added a formula for redistricting in Section 9A of Article V of the Oklahoma Constitution. The formula provided for nineteen Senate districts with one Senator from each of the most populous counties along with twenty-nine two-county districts from the fifty-eight less populous counties. It also listed several social, geo-

---

**11.** We hereby deny Senator Wilson's motion for a briefing schedule and evidentiary hearing, even though after filing the motion, he admitted there was no need for a briefing schedule.

graphic, and political factors to be considered by providing that "[i]n apportioning the State Senate, consideration shall be given to population, compactness, area, political units, historical precedents, economic and political interests, contiguous territory, and other major factors, to the extent feasible." Okla. Const. Art. V, § 9A.

¶ 2 Less than one month after that election, the United States Supreme Court handed down *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), which established that in order to pass constitutional muster, population rather than location must be the predominate consideration in the apportionment of electoral districts. *Reynolds* specifically rejected an approach in which population is the *only* factor, noting that "[m]athematical exactness or precision is hardly a workable constitutional requirement." 377 U.S. at 577, 84 S.Ct. 1362. The *Reynolds* Court acknowledged the legitimate function of such factors as compactness, area, political units, historical precedents, and economic and political interests when it stated:

A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. Valid considerations may underlie such aims. Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering.... Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State.

*Id.* at 578–579, 84 S.Ct. 1362.

¶ 3 By today's decision, this Court strikes only the county-based aspect of the Section 9A formula to meet the requirement of *Reynolds* that population be the controlling criterion in evaluating a redistricting plan.

The remaining "population apportionment formula" includes the Section 9A factors of "compactness, area, political units, historical precedents, economic and political interests, contiguous territory, and other major factors."

¶ 4 Today's decision recognizes that factors other than population can be the tool for achieving voter equality as well as the tool for its circumvention. The problem is not in the tool. Rather it is in its application. That is why those factors continue to be utilized by states in their constitutional and statutory redistricting schemes[1] and by state and federal courts in evaluating whether a redistricting plan unconstitutionally furthers invidious discrimination. *See, e.g., Voinovich v. Quilter*, 507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) (applying several of the factors listed in Section 9A to a claim of racial gerrymandering). The proper focus of redistricting and judicial review of redistricting plans is voter equality rather than mathematical uniformity of population among the districts because "the achieving of fair and effective representation for all citizens is ... the basic aim of legislative apportionment." *Reynolds*, 377 U.S. at 565–566, 84 S.Ct. 1362.

¶ 5 In this matter, no claim of gerrymandering based on race or economic status has been asserted. The claim is that political gerrymandering was involved in the redistricting. In 2004, the United States Supreme Court in *Vieth v. Jubelirer*, 541 U.S. 267, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004), held all claims of political gerrymandering to be nonjusticiable in federal court because no judicially discernable and manageable standards for adjudicating such claims exist. The clear implication of *Vieth* is that if a state court has judicially discernable and manageable standards, it is justified in adjudicating claims of political gerrymandering. Those standards, however, are derived from a states statutory and/or constitutional scheme for redistricting. By contrast, claims of racial or economic gerrymandering are

---

1. New Jersey, for example, has a special commission to establish Congressional redistricting. N.J. Const. Art. II, § 2. Iowa has very specific protections against gerrymandering. Iowa's re-

districting standards mandate the use of a set of factors that include population, compactness, area, political units, political interests, and contiguous territory. Iowa Code § 42.4.

subject to strict scrutiny under the 14th Amendment.

¶ 6 In this political gerrymandering claim, the problem is that the fact specific factors listed in Section 9A are not sufficient to provide discernable and manageable standards by which this Court may adjudicate a claim of political gerrymandering in an Article V, Section 11C review proceeding. However, the factors are sufficient to guide the District Court in making the fact determinations necessary to determine whether political gerrymandering has occurred or whether some form of voter discrimination has been perpetrated in contravention of the 14th Amendment or the Voting Rights Act.